*359 Justice Stevens
delivered the opinion of the Court.
Petitioner Jose Padilla, a native of Honduras, has been a lawful permanent resident of the United States for more than 40 years. Padilla served this Nation with honor as a member of the U. S. Armed Forces during the Vietnam War. He now faces deportation after pleading guilty to the transportation of a large amount of marijuana in his tractor-trailer in the Commonwealth of Kentucky.[1]
In this postconviction proceeding, Padilla claims that his counsel not only failed to advise him of this consequence prior to his entering the plea, but also told him that he “ 'did not have to worry about immigration status since he had been in the country so long’” 253 S. W. 3d 482, 483 (Ky. 2008). Padilla relied on his counsel’s erroneous advice when he pleaded guilty to the drug charges that made his deportation virtually mandatory. He alleges that he would have insisted on going to trial if he had not received incorrect advice from his attorney.
Assuming the truth of his allegations, the Supreme Court of Kentucky denied Padilla postconviction relief without the benefit of an evidentiary hearing. The court held that the Sixth Amendment’s guarantee of effective assistance of counsel does not protect a criminal defendant from erroneous advice about deportation because it is merely a “collateral” con *360 sequence of his conviction. Id., at 485. In its view, neither counsel’s failure to advise petitioner about the possibility of removal, nor counsel’s incorrect advice, could provide a basis for relief.
We granted certiorari, 555 U. S. 1169 (2009), to decide whether, as a matter of federal law, Padilla’s counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country. We agree with Padilla that constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation. Whether he is entitled to relief depends on whether he has been prejudiced, a matter that we do not address.
I
The landscape of federal immigration law has changed dramatically over the last 90 years. While once there was only a narrow class of deportable offenses and judges wielded broad discretionary authority to prevent deportation, immigration reforms over time have expanded the class of deport-able offenses and limited the authority of judges to alleviate the harsh consequences of deportation. The “drastic measure” of deportation or removal, Fong Haw Tan v. Phelan, 333 U. S. 6, 10 (1948), is now virtually inevitable for a vast number of noncitizens convicted of crimes.
The Nation’s first 100 years was “a period of unimpeded immigration.” C. Gordon & H. Rosenfield, Immigration Law and Procedure §1.2a, p. 5 (1959). An early effort to empower the President to order the deportation of those immigrants he “judge[d] dangerous to the peace and safety of the United States,” Act of June 25, 1798, ch. 58, 1 Stat. 571, was short lived and unpopular. Gordon § 1.2, at 5. It was not until 1875 that Congress first passed a statute barring convicts and prostitutes from entering the country, Act of Mar. 3, 1875, ch. 141, 18 Stat. 477. Gordon § 1.2b, at 6. In 1891, Congress added to the list of excludable persons those “who have been convicted of a felony or other infamous *361 crime or misdemeanor involving moral turpitude.” Act of Mar. 3,1891, ch. 551, 26 Stat. 1084.[2]
The Immigration Act of 1917 (1917 Act) brought “radical changes” to our law. S. Rep. No. 1515, 81st Cong, 2d Sess., 54-55 (1950). For the first time in our history, Congress made classes of noncitizens deportable based on conduct committed on American soil. Id., at 55. Section 19 of the 1917 Act authorized the deportation of “any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States . . ..” 39 Stat. 889. And §19 also rendered deportable noncitizen recidivists who commit two or more crimes of moral turpitude at any time after entry. Ibid. Congress did not, however, define the term “moral turpitude.”
While the 1917 Act was “radical” because it authorized deportation as a consequence of certain convictions, the Act also included a critically important procedural protection to minimize the risk of unjust deportation: At the time of sentencing or within 30 days thereafter, the sentencing judge in both state and federal prosecutions had the power to make a recommendation “that such alien shall not be deported.” Id., at 890.[3] This procedure, known as a judicial recommen *362 dation against deportation, or JRAD, had the effect of binding the Executive to prevent deportation; the statute was “consistently .. . interpreted as giving the sentencing judge conclusive authority to decide whether a particular conviction should be disregarded as a basis for deportation,” Janvier v. United States, 793 F. 2d 449, 452 (CA2 1986). Thus, from 1917 forward, there was no such creature as an automatically deportable offense. Even as the class of'deport-able offenses expanded, judges retained discretion to ameliorate unjust results on a case-by-case basis.
Although narcotics offenses — such as the offense at issue in this case — provided a distinct basis for deportation as early as 1922,[4] the JRAD procedure was generally available to avoid deportation in narcotics convictions. See United States v. O’Rourke, 213 F. 2d 759, 762 (CA8 1954). Except for “technical, inadvertent and insignificant violations of the laws relating to narcotics,” ibid., it appears that courts treated narcotics offenses as crimes involving moral turpitude for purposes of the 1917 Act’s broad JRAD provision. See ibid, (recognizing that until 1952 a JRAD in a narcotics *363 case “was effective to prevent deportation” (citing Dang Nam v. Bryan, 74 F. 2d 379, 380-381 (CA9 1934))).
In light of both the steady expansion of deportable offenses and the significant ameliorative effect of a JRAD, it is unsurprising that, in the wake of Strickland v. Washington, 466 U. S. 668 (1984), the Second Circuit held that the Sixth Amendment right to effective assistance of counsel applies to a JRAD request or lack thereof, see Janvier, 793 F. 2d 449. See also United States v. Castro, 26 F. 3d 557 (CA5 1994). In its view, seeking a JRAD was “part of the sentencing” process, Janvier, 793 F. 2d, at 452, even if deportation itself is a civil action. Under the Second Circuit’s reasoning, the impact of a conviction on a noncitizen’s ability to remain in the country was a central issue to be resolved during the sentencing process — not merely a collateral matter outside the scope of counsel’s duty to provide effective representation.
However, the JRAD procedure is no longer part of our law. Congress first circumscribed the JRAD provision in the 1952 Immigration and Nationality Act (INA),[5] and in 1990 Congress entirely eliminated it, 104 Stat. 5050. In 1996, Congress also eliminated the Attorney General’s authority to grant discretionary relief from deportation, 110 Stat. 3009-596, an authority that had been exercised to prevent the deportation of over 10,000 noncitizens during the 5-year period prior to 1996, INS v. St. Cyr, 533 U. S. 289, 296 (2001). Under contemporary law, if a noncitizen has committed a removable offense after the 1996 effective date of these amend *364 ments, his removal is practically inevitable but for the possible exercise of limited remnants of equitable discretion vested in the Attorney General to cancel removal for non-citizens convicted of particular classes of offenses.[6] See 8 U. S. C. § 1229b. Subject to limited exceptions, this discretionary relief is not available for an offense related to trafficking in a controlled substance. See § 1101 (a)(43)(B); § 1228.
These changes to our immigration law have dramatically raised the stakes of a noncitizen’s criminal conviction. The importance of accurate legal advice for noncitizens accused of crimes has never been more important. These changes confirm our view that, as a matter of federal law, deportation is an integral part — indeed, sometimes the most important part[7] — of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes.
II
Before deciding whether to plead guilty, a defendant is entitled to “the effective assistance of competent counsel.” McMann v. Richardson, 397 U. S. 759, 771 (1970); Strickland, 466 U. S., at 686. The Supreme Court of Kentucky rejected Padilla’s ineffectiveness claim on the ground that the advice he sought about the risk of deportation concerned only collateral matters, i. e., those matters not within the sentencing authority of the state trial court.[8] 253 S. W. 3d, *365 at 483-484 (citing Commonwealth v. Fuartado, 170 S. W. 3d 384 (2005)). In its view, “collateral consequences are outside the scope of representation required by the Sixth Amendment,” and, therefore, the “failure of defense counsel to advise the defendant of possible deportation consequences is not cognizable as a claim for ineffective assistance of counsel.” 253 S. W. 3d, at 483. The Kentucky high court is far from alone in this view.[9]
We, however, have never applied a distinction between direct and collateral consequences to define the scope of constitutionally “reasonable professional assistance” required under Strickland, 466 U. S., at 689. Whether that distinction is appropriate is a question we need not consider in this case because of the unique nature of deportation.
We have long recognized that deportation is a particularly severe “penalty,” Fong Yue Ting v. United States, 149 U. S. 698, 740 (1893); but it is not, in a strict sense, a criminal sanction. Although removal proceedings are civil in nature, see INS v. Lopez-Mendoza, 468 U. S. 1032, 1038 (1984), deportation is nevertheless intimately related to the criminal process. Our law has enmeshed criminal convictions and *366 the penalty of deportation for nearly a century, see Part I, supra, at 360-364. And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders. Thus, we find it “most difficult” to divorce the penalty from the conviction in the deportation context. United States v. Russell, 686 F. 2d 35, 38 (CADC 1982). Moreover, we are quite confident that noncitizen defendants facing a risk of deportation for a particular offense find it even more difficult. See St Cyr, 533 U. S., at 322 (“There can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions”).
Deportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence. The collateral versus direct distinction is thus ill suited to evaluating a Strickland claim concerning the specific risk of deportation. We conclude that advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel. Strickland applies to Padilla’s claim.
III
Under Strickland, we first determine whether counsel’s representation “fell below an objective standard of reasonableness.” 466 U. S., at 688. Then we ask whether “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id., at 694. The first prong — constitutional deficiency — is necessarily linked to the practice and expectations of the legal community: “The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.” Id., at 688. We long have recognized that “[prevailing norms of practice as reflected in American Bar Association standards and the like . .. are guides to determining what is reasonable . . . .” Ibid.; *367 Bobby v. Van Hook, 558 U. S. 4, 7 (2009) (per curiam); Florida v. Nixon, 543 U. S. 175, 191, and n. 6 (2004); Wiggins v. Smith, 539 U. S. 510, 524 (2003); Williams v. Taylor, 529 U. S. 362, 396 (2000). Although they are “only guides,” Strickland, 466 U. S., at 688, and not “inexorable commands,” Bobby, 558 U. S., at 8, these standards may be valuable measures of the prevailing professional norms of effective representation, especially as these standards have been adapted to deal with the intersection of modern criminal prosecutions and immigration law.
The weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation. National Legal Aid and Defender Assn., Performance Guidelines for Criminal Defense Representation § 6.2 (1995); G. Herman, Plea Bargaining § 3.03, pp. 20-21 (1997); Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L. Rev. 697, 713-718 (2002); A. Campbell, Law of Sentencing §13:23, pp. 555, 560 (3d ed. 2004); Dept. of Justice, Office of Justice Programs, 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance, pp. DIO, H8-H9, J8 (2000) (providing survey of guidelines across multiple jurisdictions); ABA Standards for Criminal Justice, Prosecution Function and Defense Function 4-5.1(a), p. 197 (3d ed. 1993); ABA Standards for Criminal Justice, Pleas of Guilty 14-3.2(f), p. 116 (3d ed. 1999). “ [Authorities of every stripe — including the American Bar Association, criminal defense and public defender organizations, authoritative treatises, and state and city bar publications — universally require defense attorneys to advise as to the risk of deportation consequences for non-citizen clients . . . .” Brief for Legal Ethics, Criminal Procedure, and Criminal Law Professors as Amici Curiae 12-14 (footnotes omitted) (citing, inter alia, National Legal Aid and Defender Assn., Performance Guidelines for Criminal Prosecution §§6.2-6.4 (1997); S. Bratton & E. Kelley, Practice Points: Representing a Non- *368 citizen in a Criminal Case, 31 The Champion 61 (Jan./Feb. 2007); N. Tooby, Criminal Defense of Immigrants § 1.3 (3d ed. 2003); 2 Criminal Practice Manual §§45:3,45:15 (West 2009)).
We too have previously recognized that “ ‘[preserving the client’s right to remain in the United States may be more important to the client than any potential jail sentence.’” St. Cyr, 533 U. S., at 322 (quoting 3 Bender, Criminal Defense Techniques §§60A.01, 60A.02[2] (1999)). Likewise, we have recognized that “preserving the possibility of” discretionary relief from deportation under § 212(c) of the 1952 INA, 66 Stat. 187, repealed by Congress in 1996, “would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial.” St. Cyr, 533 U. S., at 323. We expected that counsel who were unaware of the discretionary relief measures would “follofw] the advice of numerous practice guides” to advise themselves of the importance of this particular form of discretionary relief. Ibid., n. 50.
In the instant case, the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for Padilla’s conviction. See 8 U. S. C. § 1227(a)(2)(B)(i) (“Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance . . . , other than a single offense involving possession for one’s own use of 30 grams or less of marijuana, is deportable”). Padilla’s counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses. Instead, Padilla’s counsel provided him false assurance that his conviction would not result in his removal from this country. This is not a hard case in which to find deficiency: *369 The consequences of Padilla’s plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel’s advice was incorrect.
Immigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it. There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain. The duty of the private practitioner in such cases is more limited. When the law is not succinct and straightforward (as it is in many of the scenarios posited by Justice Alito), a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences.[10] But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.
Accepting his allegations as true, Padilla has sufficiently alleged constitutional deficiency to satisfy the first prong of Strickland. Whether Padilla is entitled to relief on his claim will depend on whether he can satisfy Strickland’s second prong, prejudice, a matter we leave to the Kentucky courts to consider in the first instance.
IV
The Solicitor General has urged us to conclude that Strickland applies to Padilla’s claim only to the extent that he has alleged affirmative misadvice. In the United States’ view, “counsel is not constitutionally required to provide advice on matters that will not be decided in the criminal case . . . ,” though counsel is required to provide accurate advice if she *370 chooses to discuss these matters. Brief for United States as Amicus Curiae 10.
Respondent and Padilla both find the Solicitor General’s proposed rule unpersuasive, although it has support among the lower courts. See, e. g., United States v. Couto, 311 F. 3d 179, 188 (CA2 2002); United States v. Kwan, 407 F. 3d 1005 (CA9 2005); Sparks v. Sowders, 852 F. 2d 882 (CA6 1988); United States v. Russell, 686 F. 2d 35 (CADC 1982); State v. Rojas-Martinez, 2005 UT 86, 125 P. 3d 930, 935; In re Resendiz, 25 Cal. 4th 230, 19 P. 3d 1171 (2001). Kentucky describes these decisions isolating an affirmative misadvice claim as “result-driven, incestuous . . . [, and] completely lacking in legal or rational bases.” Brief for Respondent 31. We do not share that view, but we agree that there is no relevant difference “between an act of commission and an act of omission” in this context. Id., at 30; Strickland, 466 U. S., at 690 (“The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance”); see also State v. Paredez, 2004-NMSC-036, 136 N. M. 533, 538-539.
A holding limited to affirmative misadvice would invite two absurd results. First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. Silence under these circumstances would be fundamentally at odds with the critical obligation of counsel to advise the client of “the advantages and disadvantages of a plea agreement.” Libretti v. United States, 516 U. S. 29, 50-51 (1995). When attorneys know that their clients face possible exile from this country and separation from their families, they should not be encouraged to say nothing at all.[11] Second, it would deny a *371 class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available. It is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation, and the failure to do so “clearly satisfies the first prong of the Strickland analysis.” Hill v. Lockhart, 474 U. S. 52, 62 (1985) (White, J., concurring in judgment).
We have given serious consideration to the concerns that the Solicitor General, respondent, and amici have stressed regarding the importance of protecting the finality of convictions obtained through guilty pleas. We confronted a similar “floodgates” concern in Hill, see id., at 58, but nevertheless applied Strickland to a claim that counsel had failed to advise the client regarding his parole eligibility before he pleaded guilty.[12]
A flood did not follow in that decision’s wake. Surmounting Strickland’s high bar is never an easy task. See, e. g., 466 U. S., at 689 (“Judicial scrutiny of counsel’s performance must be highly deferential”); id., at 693 (observing that “[a]ttorney errors ... are as likely to be utterly harmless in a *372 particular case as they are to be prejudicial”). Moreover, to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances. See Roe v. Flores-Ortega, 528 U. S. 470, 480, 486 (2000). There is no reason to doubt that lower courts — now quite experienced with applying Strickland — can effectively and efficiently use its framework to separate specious claims from those with substantial merit.
It seems unlikely that our decision today will have a significant effect on those convictions already obtained as the result of plea bargains. For at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice on the deportation consequences of a client’s plea. See supra, at 368-371. We should, therefore, presume that counsel satisfied their obligation to render competent advice at the time their clients considered pleading guilty. Strickland, 466 U. S., at 689.
Likewise, although we must be especially careful about recognizing new grounds for attacking the validity of guilty pleas, in the 25 years since we first applied Strickland to claims of ineffective assistance at the plea stage, practice has shown that pleas are less frequently the subject of collateral challenges than convictions obtained after a trial. Pleas account for nearly 95% of all criminal convictions.[13] But they account for only approximately 30% of the habeas petitions filed.[14] The nature of relief secured by a successful collat *373 eral challenge to a guilty plea — an opportunity to withdraw the plea and proceed to trial — imposes its own significant limiting principle: Those who collaterally attack their guilty pleas lose the benefit of the bargain obtained as a result of the plea. Thus, a different calculus informs whether it is wise to challenge a guilty plea in a habeas proceeding because, ultimately, the challenge may result in a less favorable outcome for the defendant, whereas a collateral challenge to a conviction obtained after a jury trial has no similar downside potential.
Finally, informed consideration of possible deportation can only benefit both the State and noncitizen defendants during the plea-bargaining process. By bringing deportation consequences into this process, the defense and prosecution may well be able to reach agreements that better satisfy the interests of both parties. As in this case, a criminal episode may provide the basis for multiple charges, of which only a subset mandate deportation following conviction. Counsel who possess the most rudimentary understanding of the deportation, consequences of a particular criminal offense may be able to plea bargain creatively with the prosecutor in order to craft a conviction and sentence that reduce the likelihood of deportation, as by avoiding a conviction for an offense that automatically triggers the removal consequence. At the same time, the threat of deportation may provide the defendant with a powerful incentive to plead guilty to an offense that does not mandate that penalty in exchange for a dismissal of a charge that does.
In sum, we have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel. Hill, 474 U. S., at 57; see also Richardson, 397 U. S., at 770-771. The severity of deportation — “the equivalent of banishment or exile,” Delgadillo v. Carmichael, 332 U. S. 388, 390-391 (1947) — only underscores how critical it is for coun *374 sel to inform her noncitizen client that he faces a risk of deportation.[15]
V
It is our responsibility under the Constitution to ensure that no criminal defendant — whether a citizen or not — is left to the “mercies of incompetent counsel.” Richardson, 397 U. S., at 771. To satisfy this responsibility, we now hold that counsel must inform her client whether his plea carries a risk of deportation. Our longstanding Sixth Amendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less.
Taking as true the basis for his motion for postconviction relief, we have little difficulty concluding that Padilla has sufficiently alleged that his counsel was constitutionally deficient. Whether Padilla is entitled to relief will depend on whether he can demonstrate prejudice as a result thereof, a question we do not reach because it was not passed on below. *375 See Verizon Communications Inc. v. FCC, 535 U. S. 467, 530 (2002).
The judgment of the Supreme Court of Kentucky is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

 Padilla’s crime, like virtually every drug offense except for only the most insignificant marijuana offenses, is a deportable offense under 8 U. S. C. § 1227(a)(2)(B)(i).

 In 1907, Congress expanded the class of excluded persons to include individuals who “admit” to having committed a crime of moral turpitude. Act of Feb. 20, 1907, ch. 1134, §2,34 Stat. 899.

 As enacted, the statute provided:
“That the provision of this section respecting the deportation of aliens convicted of a crime involving moral turpitude shall not apply to one who has been pardoned, nor shall such deportation be made or directed if the court, or judge thereof, sentencing such alien for such crime shall, at the time of imposing judgment or passing sentence or within thirty days thereafter, . . . make a recommendation to the Secretary of Labor that such alien shall not be deported in pursuance of this Act.” 1917 Act, 39 Stat. 889-890.
This provision was codified in 8 U. S. C. § 1251(b) (1994 ed.) (transferred to § 1227 (2006 ed.)). The judge's nondeportation recommendation was bind- *362 mg on the Secretary of Labor and, later, the Attorney General after control of immigration removal matters was transferred from the former to the latter. See Janvier v. United States, 793 F. 2d 449, 452 (CA2 1986).

 Congress first identified narcotics offenses as a special category of crimes triggering deportation in the 1922 Narcotic Drug Act. Act of May 26,1922, ch. 202, 42 Stat. 596. After the 1922 Act took effect, there was some initial confusion over whether a narcotics offense also had to be a crime of moral turpitude for an individual to be deportable. See Weedin v. Moy Fat, 8 F. 2d 488, 489 (GA9 1925) (holding that an individual who committed narcotics offense was not deportable because offense did not involve moral turpitude). However, lower courts eventually agreed that the narcotics offense provision was “special,” Chung Que Fong v. Nagle, 15 F. 2d 789, 790 (CA9 1926); thus, a narcotics offense did not need also to be a crime of moral turpitude (or to satisfy other requirements of the 1917 Act) to trigger deportation. See United States ex rel. Grimaldi v. Ebey, 12 F. 2d 922, 923 (CA7 1926); Todaro v. Munster, 62 F. 2d 963, 964 (CA10 1933).

 The INA separately codified the moral turpitude offense provision and the narcotics offense provision -within 8 U. S. C. § 1251(a) (1994 ed.) under subsections (a)(4) and (a)(11), respectively. See 66 Stat. 201, 204, 206. The JRAD procedure, codified in 8 U. S. C. § 1251(b) (1994 ed.), applied only to the “provisions of subsection (a)(4),” the crimes-of-moral-turpitude provision. 66 Stat. 208; see United States v. O’Rourke, 213 F. 2d 759, 762 (CA8 1954) (recognizing that, under the 1952 INA, narcotics offenses were no longer eligible for JRADs).

 The changes to our immigration law have also involved a change in nomenclature; the statutory text now uses the term “removal” rather than “deportation.” See Calcano-Martinez v. INS, 533 U. S. 348, 350, n. 1 (2001).

 See Brief for Asian American Justice Center et al. as Amici Curiae 12-27 (providing real-world examples).

 There is some disagreement among the courts over how to distinguish between direct and collateral consequences. See Roberts, Ignorance Is Effectively Bliss: Collateral Consequences, Silence, and Misinformation in the Guilty-Plea Process, 95 Iowa L. Rev. 119, 124, n. 15 (2009). The disagreement over how to apply the direet/eollateral distinction has no bear *365 ing on the disposition of this case because, as even Justice Auto agrees, counsel must, at the very least, advise a noncitizen “defendant that a criminal conviction may have adverse immigration consequences,” post, at 375 (opinion concurring in judgment). See also post, at 387 (“I do not mean to suggest that the Sixth Amendment does no more than require defense counsel to avoid misinformation”). In his concurring opinion, Justice Auto has thus departed from the strict rule applied by the Supreme Court of Kentucky and in the two federal cases that he dtes, post, at 375-376.

 See, e.g., United States v. Gonzalez, 202 F. 3d 20 (CA1 2000); United States v. Del Rosario, 902 F. 2d 55 (CADC 1990); United States v. Yearwood, 863 F. 2d 6 (CA4 1988); Santos-Sanchez v. United States, 548 F. 3d 327 (CA5 2008); Broomes v. Ashcroft, 358 F. 3d 1251 (CA10 2004); United States v. Campbell, 778 F. 2d 764 (CA11 1985); Oyekoya v. State, 558 So. 2d 990 (Ala. Crim. App. 1989); State v. Rosas, 183 Ariz. 421, 904 P. 2d 1245 (App. 1995); State v. Montalban, 2000-2739 (La. 2/26/02), 810 So. 2d 1106; Commonwealth v. Frometa, 520 Pa. 552, 555 A. 2d 92 (1989).

 As Justice Auto explains at length, deportation consequences are often unclear. Lack of clarity in the law, however, does not obviate the need for counsel to say something about the possibility of deportation, even though it will affect the scope and nature of counsel’s advice.

 As the Commonwealth conceded at oral argument, were a defendant’s lawyer to know that a particular offense would result in the client’s deportation and that, upon deportation, the client and his family might well be killed due to circumstances in the client’s home country, any decent attor *371 ney would inform the client of the consequences of his plea. Tr. of Oral Arg. 37-38. We think the same result should follow when the stakes are not life and death but merely “banishment or exile,” Delgadillo v. Carmichael, 332 U. S. 388, 390-391 (1947).

However, we concluded that, even though Strickland applied to petitioner’s claim, he had not sufficiently alleged prejudice to satisfy Strickland’s second prong. Hill, 474 U. S., at 59-60. This disposition further underscores the fact that it is often quite difficult for petitioners who have acknowledged their guilt to satisfy Strickland’s prejudice prong.
Justice Auto believes that the Court misreads Hill, post, at 383-384. In Hill, the Court recognized — for the first time — that Strickland applies to advice respecting a guilty plea. 474 U. S., at 58 (“We hold, therefore, that the two-part Strickland v. Washington test applies to challenges to guilty pleas based on ineffective assistance of counsel”). It is true that Hill does not control the question before us. But its import is nevertheless clear. Whether Strickland applies to Padilla’s claim follows from Hill, regardless of the fact that the Hill Court did not resolve the particular question respecting misadvice that was before it.

 See Dept. of Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics 2003, p. 418 (31st ed. 2005) (Table 5.17) (only approximately 5%, or 8,612 out of 68,533, of federal criminal prosecutions go to trial); id., at 450 (Table 5.46) (only approximately 5% of all state felony criminal prosecutions go to trial).

 See V. Flango, National Center for State Courts, Habeas Corpus in State and Federal Courts 36-38 (1994) (demonstrating that 5% of defendants whose conviction was the result of a trial account for approximately 70% of the habeas petitions filed).

 To this end, we find it significant that the plea form currently used in Kentucky courts provides notice of possible immigration consequences. Ky. Admin. Office of Courts, Motion to Enter Guilty Plea, Form AOC-491 (rev. Feb. 2003), http://courts.ky.gov/NR/rdonlyres/55ElF54E-ED5C4A30-BlD5-4C43C7ADD63C/0/491.pdf (as visited Mar. 29,2010, and available in Clerk of Court’s case file). Further, many States require trial courts to advise defendants of possible immigration consequences. See, e. g., Alaska Rule Crim. Proc. 11(c)(3)(C) (2009-2010); Cal. Penal Code Ann. §1016.5 (West 2008); Conn. Gen. Stat. §54-lj (2009); D. C. Code §16-713 (2001); Fla. Rule Crim. Proc. 3.172(c)(8) (Supp. 2010); Ga. Code Ann. § 17-7-93(c) (1997); Haw. Rev. Stat. Ann. §802E-2 (2007); Iowa Rule Crim. Proc. 2.8(2)(&)(3) (Supp. 2009); Md. Rule 4-242 (Lexis 2009); Mass. Gen. Laws, ch. 278, §29D (West 2009); Minn. Rule Crim. Proc. 15.01 (2009); Mont. Code Ann. §46-12-210 (West 2009); N. M. Rule Crim. Form 9-406 (2009); N. Y. Crim. Proc. Law Ann. §220.50(7) (West Supp. 2009); N. C. Gen. Stat. Ann. §15A-1022 (Lexis 2007); Ohio Rev. Code Ann. §2943.031 (West 2006); Ore. Rev. Stat. § 135.385 (2007); R. I. Gen. Laws § 12-12-22 (Lexis Supp. 2008); Tex. Code Crim. Proc. Ann., Art. 26.13(a)(4) (Vernon Supp. 2009); Vt. Stat. Ann., Tit. 13, § 6565(c)(1) (Supp. 2009); Wash. Rev. Code §10.40.200 (2008); Wis. Stat. §971.08 (2005-2006).