Fabian NASH, Petitioner,

v.

UNITED STATES of America, Respondent.

14 CV 7590 (ILG)

United States District Court, E.D. New York.

Signed April 8, 2015

## MEMORANDUM AND ORDER

GLASSER, United States District Judge

The defendant moved this Court for the issuance of an Order that would vacate his conviction following his plea of guilty to conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 846 and possessing a firearm during and in relation to the drug offense in violation of 18 U.S.C. § 924(c). He was 18 years old at the time. Those crimes were committed over a period of only two months.

### Background

Mr. Nash pleaded guilty pursuant to an agreement on June 26, 2009, and sentence was scheduled to be imposed on October 1, 2009. By that agreement, however, he consented to adjournments of his sentence as requested by the government. Those requests which were subsequently made caused Mr. Nash's sentence to be adjourned to May 14, 2013. In anticipation of his sentence, the Court was advised in a letter from his defense counsel dated May 10th, that the parties became aware that he was a lawful permanent resident and not a citizen of the United States and was not advised of the immigration consequences of his guilty plea. In the light of the then recently decided *Padilla v. Kentucky*, 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), the parties requested "additional time to consider the manner in which to proceed." Sentencing was adjourned for one month until June 14th. Michelle Gelernt was defense counsel and AUSA Shreve Ariail was the prosecutor. Portions of the transcript of that proceeding which present with crystal clarity the core of this motion are here set out.

MS. GELERNT: I guess, your Honor, the issue is as we were preparing for sentencing and I was reviewing the sen-

tencing minutes and the agreement, it became apparent that Mr. Nash had not been advised of the immigration consequences.

THE COURT: Okay.

MS. GELERNT: Mr. Nash and I have had a working relationship now for about four years, and I think we have a good working relationship.

THE COURT: Yes?

MS. GELERNT: In terms of the issues, I wasn't sure whether or not at least for—I think technically he would have the right to withdraw his plea.

THE COURT: Exactly.

MS. GELERNT: And I wasn't sure if because I was the lawyer who took the plea whether it was appropriate for me to be the lawyer who advised him on whether or not to withdraw it or whether or not, you know, to be entirely cautious about it, whether or not CJA should be assigned just for the purpose of explaining to him the possible conflict and that type of thing. So it was in excess of caution that I felt like the record should be—

* * *

THE COURT: Good morning, Mr. Nash.

THE DEFENDANT: Good morning.

THE COURT: I'm sure that Ms. Gelernt has given you a very clear and complete breakdown of what all this is about.

Let me try to explain it to you as clearly as I know how. You are not a citizen of the United States. You are here as a permanent resident.

THE DEFENDANT: Yes, sir.

THE COURT: When you pleaded guilty, you may recall that I asked you whether you knew that the maximum sentence or the punishment that the law provides for for the crime that you are charged with and were going to plead guilty was a minimum of ten years, a maximum of life, and all the rest; and I talked to you about supervised release and I talked to you about a special assessment of $200, which was mandatory.

But one of the things you should have been told—and I should have told you, if I had been made aware of the fact that you weren't a citizen, and so we were not doing all the things we should have been doing because we didn't—I didn't know that you were not a citizen. Whether the government knew it, whether anybody else knew it is irrelevant at this point.

Because you are not a citizen you should have been told at the time, before you entered your plea of guilty, that the crime with which you were charged, particularly count one, which dealt with a conspiracy to distribute crack, that's a crime which may very well result in your deportation to Jamaica, were you to plead guilty. At that point, knowing what the possible consequence of pleading guilty might be, you could have decided that you don't want to plead guilty. You could have decided that you just as soon go to trial and take your chances of being acquitted of the crime rather than pleading guilty and facing the real possibility that you may be deported.

The Supreme Court of the United States, two years ago—I think it was 2010—decided that if a person pleads guilty but he wasn't informed before he did that one of the consequences of pleading guilty might be his deportation, then he might be able to withdraw his plea. I say "might" because the court would have to make a determination whether technically your lawyer did not provide the assistance that a lawyer should have provided in not telling you

what the consequences of pleading may be; namely, deportation.

A claim which is very frequently made, particularly after a trial and after a defendant has been found guilty, is he then tells the court that I was not given the effective assistance of counsel, and he wants to upset his conviction. The court would have to decide two things before it grants it, one of which is, I think, significant for you to think about: One, whether the lawyer was ineffective in providing assistance, that is, the lawyer should have told you that you might be deported; and second, not having told you, would it make a difference. In other words, had you known, would you have decided to go to trial rather than plead guilty.

So the court would have to be satisfied that those two things would be fulfilled. So the question is, first, because the Supreme Court decided as it did, there was ineffective assistance of counsel in not having told you before you pleaded guilty that you might be deported if you were; and the second piece of it is that would it have made any difference to you, if you had been told, would you have nevertheless gone ahead with your guilty plea or would you have decided at that point, no, I just as soon go to trial.

Is that a little much for you?

THE DEFENDANT: No. I understand what you are saying.

THE COURT: You understood all that?

THE DEFENDANT: Yes.

THE COURT: So you have a right to ask me to withdraw your plea of guilty if that's something you think you might want to do.

THE DEFENDANT: No, sir.

THE COURT: Pardon?

THE DEFENDANT: No.

MS. GELERNT: Just wait for the judge to finish.

THE DEFENDANT: I'm sorry. I thought he was asking me a question.

THE COURT: Now, I want to make sure that you understand that I will be—I will not only be happy to, I will, I should, if you wish, appoint another lawyer that you can consult with to discuss this issue with him or with her, and decide whether you want to withdraw your guilty plea, if you think that's important for you to do. I will be more than happy to grant that request.

THE DEFENDANT: I don't want to withdraw my plea.

THE COURT: Pardon?

THE DEFENDANT: I said I do not want to withdraw my plea.

THE COURT: Do you understand or have you understood everything that I have explained to you this morning?

THE DEFENDANT: Yes.

THE COURT: Had you known before you pleaded guilty a couple of years ago now—I don't know how far back it was. Is it three or four years at this point?

MR. ARIAIL: About four years ago, your Honor.

THE COURT: Had you known at that time what the possible consequence of pleading guilty would be, would you have nevertheless pleaded guilty at that time?

THE DEFENDANT: Yes.

THE COURT: Okay. I'm fairly satisfied that we can go ahead with sentencing, if everybody is ready to do that.

MS. GELERNT: Your Honor, given the position that we were in, I haven't—I would like to submit something. I didn't feel it was appropriate to submit a sentencing memorandum on behalf of Mr. Nash until this was resolved.

THE COURT: If you want to—if you know what it is you want to say to me you can do it now.

MS. GELERNT: There is just some documentation and letters that he provided that I would like to submit in addition with something else. So if we could just have one final adjournment.

THE COURT: Okay.

MS. GELERNT: I would appreciate it. Thank you, judge.

THE COURT: Okay.

It is not insignificant to note that when Mr. Nash pleaded guilty on June 26, 2009, the failure of counsel to advise him of the collateral consequences of deportation would not have caused her assistance to be found ineffective. State and federal courts were virtually unanimous in deciding that an attorney need not give advice concerning collateral consequences of a guilty plea. *Chaidez v. United States*, — U.S. —, 133 S.Ct. 1103, 1106, 185 L.Ed.2d 149 (2013); *Russo v. United States*, 173 F.3d 846 (table), 1999 WL 164951, at *2 (2d Cir. Mar. 22, 1999) ("Counsel cannot be found ineffective for the mere failure to inform a defendant of the collateral consequences of a plea, such as deportation.")

In *Padilla*, the court decided that counsel was ineffective for not advising the defendant that he would almost certainly be deported by pleading guilty. That decision was announced on March 31, 2010. Almost three years later, on February 20, 2013, the Supreme Court held in *Chaidez, supra*, that *Padilla* did not apply retroactively to defendants whose convictions became final prior to its decision. Had Mr. Nash been sentenced on October 1, 2009 as had been initially scheduled, prior to *Padilla*, Ms. Gelernt's assistance would not have been ineffective. *See Santiago v. Laclair*, 588 Fed.Appx. 1, 4 (2d Cir.2014); *Francis v. United States*, No. 12 Civ. 1362, 2013 WL 673868 (S.D.N.Y. Feb. 25, 2013).

Sentence was repeatedly adjourned upon request of the parties to July 8, 2013. The Court was informed that in the interval between his plea of guilty on June 26, 2009 and July 8, 2013, Mr. Nash obtained his GED. He received vocational training and became an automobile mechanic and a licensed motor vehicle inspector. He is a manager in the auto repair shop at which he is employed. He was expecting his first child. His mother, father and siblings are all here. The government advised that Mr. Nash voluntarily returned from North Carolina and surrendered himself. Significantly, it told the Court that "the change in Mr. Nash subsequent to his arrest, is close to breathtaking ... he's become a very productive member of society in the way that we all hope people become once they get arrested." Tr. 50–53. I sentenced Mr. Nash to probation for a term of three years, saying "I'm fairly certain I'll never see him again nor will any judge ever see him again." Tr. at 57.

Mr. Nash entered upon probation soon thereafter. He has been continuously gainfully employed. His common-law wife who is a U.S. citizen gave birth to their son who is therefore also a U.S. citizen. That employment and that family were rent asunder when Mr. Nash was arrested while at work by Customs Enforcement agents in September 2014. He has been in immigration custody since, awaiting probable deportation to the island of Jamaica. This motion to vacate his conviction is brought pursuant to the Writ *coram nobis* and 28 U.S.C. § 2255 based on his claim of ineffective assistance of counsel in the hope that if granted, he would return to being the "productive member of society" the government described him to be.

### Discussion

The defendant recognized that a motion pursuant to § 2255 must be brought within

one year following the entry of judgment. The judgment in this case was entered on July 10, 2013, DE 224, more than a year before the filing of this motion which is, therefore, time barred. 28 U.S.C. § 2255(f)(1).

An extended discussion here of the law pertaining to *coram nobis* would replicate the discussion of it I wrote in *United States v. Santiago,* 29 F.Supp.3d 232 (E.D.N.Y.2014), to which a reference will suffice. I decided there that *coram nobis* was not to be confined to correct errors in the criminal proceeding, but was persuasively applicable conceptually to that "extraordinary" case which compelled its use to achieve justice. 29 F.Supp.3d at 237–38. A reading of *Santiago* and *United States v. Mahaffy,* 693 F.3d 113 (2d Cir. 2012), will provide an understanding of that determination.

The claim for relief here is bottomed upon the ineffective assistance of counsel which requires proof that (1) counsel's performance was, in light of all the circumstances, unreasonable under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, a different result would have been obtained. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As the transcript clearly reveals, the second prong cannot be satisfied. The assistance of counsel became ineffective only when the Supreme Court declared it to be on March 31, 2010, almost a year after Nash pleaded guilty on June 26, 2009. As the record makes plain, the defendant would not have pleaded differently had he been made aware of the probable immigration consequences at that time. *See Francis v. United States, supra.* That aside, the defendant's added claim of entitlement to the relief he seeks for the rea-

son that the *Curcio* hearing was inadequate to cure any prejudice is without merit for two reasons. He has abjured prejudice and a *Curcio* hearing, *qua* hearing, was not required. Ms. Gelernt, his counsel, was not laboring under a conflict of interest, actual or potential. She owed no allegiance to any other person. Her obligation of absolute, unfettered loyalty to Mr. Nash was never in issue. *Coram nobis* is not properly invoked in this case and that motion is denied.

This case is, in reality, not about *coram nobis* at all, it is about avoiding a felt injustice to which the contemplated deportation of Mr. Nash is seen to give rise. This effort to vacate his conviction, if it were to succeed, was to assure his continued residence in the United States. Viewed dispassionately and objectively, it may be viewed as a case in which Mr. Nash was deportable in June 2009 when, as a very young man, he pleaded guilty to the crime for which he is sought to be deported now and for which he has been in immigration detention since September 2014. And yet, although deportable then, the government permitted, nay, required him to remain here for nearly six years because it needed his presence. And as has been described above by the government more elegantly in one sentence than it could be in a volume, "the change in Mr. Nash subsequent to his arrest is close to breathtaking ... he's become a very productive member of society...." A cynic might conclude that now that his presence is no longer needed by the government, he can be deported, forcibly removed from his family, his parents, his siblings, his child, from the society of which he has become a productive member. The societal or governmental interest to be served by deporting him now is difficult to fathom.[1]

1. This case presents the troubling question of

why justice cannot and sadly is not done,

In the course of sentencing Mr. Nash, I expressed the hope that something could be done about his immigration status and that I didn't know what role the government has to play in that. "Not a very powerful one" was the government's response. Tr. at 55. Recent Memoranda give reason to be optimistic about a just resolution of his immigration status. In one dated June 17, 2011, from John Morton, the then Director of U.S. Immigration and Customs Enforcement (ICE) to the relevant personnel regarding the exercise of prosecutorial discretion, he advised that individuals who warrant particular care and consideration are, among others, long term lawful permanent residents; individuals present in the United States since childhood. In a more recent Memorandum dated November 20, 2014, from Jeh Charles Johnson, the Secretary of the Department of Homeland Security, addressed to the Acting Director of ICE and other Immigration Officials regarding Policies for the Removal of *Undocumented* Immigrants, he repeatedly directed the exercise of discretion "based on individual circumstances" and the exercise of judgment by an immigration officer if the *"alien* is not a threat to the integrity of the immigration system or there are factors suggesting the *alien* should not be an enforcement priori-

ty." The emphasis on "alien" and "undocumented" is mine to note and emphasize that Mr. Nash is not an undocumented alien, but is a legal permanent resident who has been in the United States since childhood and is not a threat to the immigration system.

Of more than passing relevance are the many cases in which applications for citizenship have been made by persons with prior criminal records, and that were granted. Decided recently, but already frequently cited is *United States v. Hovsepian*, 422 F.3d 883 (9th Cir.2005), where the court wrote that an application for citizenship cannot be denied solely on his prior criminal record, where the applicant demonstrated exemplary conduct for:

> To hold otherwise would sanction a denial of citizenship where the applicant's misconduct ... was many years in the past, and where a former bad record has been followed by many years of exemplary conduct with every evidence of reformation and subsequent good moral character. Such a conclusion would require a holding that Congress had enacted a legislative doctrine of predestination and eternal damnation.

422 F.3d at 886, citing *Santamaria–Ames v. INS*, 104 F.3d 1127, 1132 (9th Cir.1996). *See also Lawson v. United States Citizen-*

---

when reasonable persons would agree that it should be even absent some ancient Latin writ to rely on. The literature is replete with references to rehabilitation as a sentencing objective and yet, when it is stunningly achieved, as it is by Mr. Nash, it is for naught, he is destined for deportation. A tenet of most, if not all religions is repentance. And yet, when the government acknowledges that Mr. Nash's repentance has been "breathtaking," it is ignored as he awaits deportation. His definitive assurances that he understood the significance of *Padilla* to his case, by his repeated insistence upon declaring his guilt and refusing to withdraw his plea could not bespeak repentance more eloquently. We speak of a defendant convicted and sentenced

as having paid his debt to society but it bears no resemblance to a proceeding in bankruptcy. The slate is not wiped clean—he is not given the opportunity to start life anew, but is, in reality, as if stamped with the Mark of Cain.

In sentencing Mr. Nash to probation and not to a term of imprisonment, I acknowledged his rehabilitation and his repentance. In effect, I regarded his debt to society as discharged, he was starting life anew. An order of deportation now, would in reality be an enhancement of the sentence I imposed and a declaration that his debt to society has not been discharged and that he is no longer welcomed here.

*ship and Immigration Services*, 795 F.Supp.2d 283, 297 (S.D.N.Y.2011) (Alien's conviction of manslaughter for killing his wife during an argument 20 years earlier did not preclude him from establishing good moral character required for naturalization.) Surely his one prior conviction for a crime far less serious than manslaughter should not preclude him from continuing to reside in the United States.

I have digressed too far from the discrete § 2255 and *coram nobis*[2] motions that were before me. In doing so, I am aware of disregarding the wise observation of Sir Francis Bacon that an "overspeaking judge is no well-tuned cymbal." Francis Bacon, Judicature in Essays (J.M. Dent & Sons) 162–63 (1958). Overspeaking, a euphemism for *obiter dicta*, is not alien to judicial opinion writing. The value such overspeaking may have for the development of the law, its desirability, its influence on opinions yet to be written, among others, has not escaped discussion. *See e.g.*, Quinn, Argument and Authority in Common Law Advocacy and Adjudication, 74 Chicago Kent Law Review 655 (1999). Inherent in those considerations is the underlying question of the role of the judge.

This digression is prompted by a perceived imminent, egregious harm immediately collateral to the filed motion. Is it within the acceptable bounds of the role of a judge to sound the well-tuned cymbal in the interest of an unwarranted and avoidable harm? Although philosophers and jurisprudents may differ, I believe that it is, on the facts of this case.

SO ORDERED.

---

2. It is interesting to note that Rule 60(e) Fed. R.Civ.P. provides that writs of *coram nobis, coram vobis* and *audita querela* are abolished, but *coram nobis* being deemed "a step in the criminal case" still has some vitality. *United States v. Morgan*, 346 U.S. 502, 505 n. 4, 74 S.Ct. 247, 98 L.Ed. 248 (1954); *See* DE 48 in 14 CV 7590.