OPINION OF THE COURT
Steven L. Barrett, J.
Unusual fact patterns often present unusual legal issues. This is such a case. This case involves the prosecution of defendant for the murder of John Pugh, whom defendant allegedly shot in the back on September 8, 1984. On March 19, 1986, defendant pleaded guilty to attempted murder in the second degree and bribery in the second degree in full satisfaction of all the counts in the instant indictment and he also pleaded guilty to one count of burglary in the third degree in full satisfaction of all the counts in indictment No. 2493/84. At the plea proceeding before the Honorable Robert Cohen, defendant admitted that he intended to cause Pugh’s death and that he attempted to cause Pugh’s death by shooting him. Defendant also admitted that he offered a police officer $25,000 not to arrest him for the shooting of Pugh. (See tr of plea proceeding attached as exhibit B to defendant’s motion at 4, 7, 8.1[1] On August 5, 1986, defendant was sentenced to concurrent indeterminate terms of imprisonment of 6 to 18 years on the attempted murder count and IV3 to 4 years on the bribery count. On August 28, 1995, having served almost 10 years of his sentence, defendant was released from prison.
On May 10, 2013, the victim, John Pugh, died. On May 17, 2013, Dr. Susan Elay, the Acting Deputy Chief Examiner of the Bronx County Office of the Chief Medical Examiner performed an autopsy on Pugh. Dr. Elay concluded that the immediate cause of Pugh’s death was sepsis, which stemmed from complications caused by the unremoved bullet that had lodged in Pugh’s spine upon the shooting by defendant in 1984. On November 6, 2013, defendant was arrested, and, on November 8, 2013, defendant was arraigned on a felony complaint charging him with murder in the second degree and was remanded. On November 14, 2013, defendant was indicted and charged with one count of murder in the second degree under indictment No. 3488/13.
In a decision with respect to indictment No. 3488/13 dated May 1, 2014, the court found: (1) the evidence presented to the *581 grand jury with respect to causation was legally sufficient; (2) the prosecution was not barred on double jeopardy grounds; (3) defendant would be given credit for the almost 10 years that he served on his sentence on the attempted murder charge if he is convicted on the pending murder charge; and (4) that defendant’s constitutional right to a speedy trial was not violated (People v Carromero, 43 Misc 3d 1218[A], 2014 NY Slip Op 50714[U] [2014]). Additionally, relying upon People v Latham (90 NY2d 795, 799 [1997]), the court denied defendant’s motion to preclude the use of his prior guilty plea at a trial on the murder charge. (Id.) This latter ruling was premised in part on the fact that defendant had not yet moved to withdraw or set aside his plea to the attempted murder charge. In the intervening year between the court’s decision and the present, based upon a conflict of interest raised by defendant’s counsel, the court assigned new counsel for defendant. That counsel has now filed a motion, pursuant to CPL 440.10 (1) (h), seeking to vacate defendant’s 1986 plea and conviction to attempted murder and bribery, which, if granted, would preclude the use at defendant’s murder trial of the factual admissions made by defendant during the course of his 1986 plea allocution. (See People v Moore, 66 NY2d 1028, 1030 [1985] [a guilty plea once withdrawn or vacated is out of the case forever for all purposes, including the use of the contents of the plea allocution on the People’s direct case or for impeachment purposes should defendant testify at trial].)[2] For the following reasons, defendant’s motion is denied.
Defendant moves for vacatur based upon the ineffective assistance of plea counsel. Specifically, defendant claims that counsel’s performance was deficient because counsel failed to apprise him prior to pleading guilty that the factual admissions he made when pleading guilty to attempted murder and bribery could be used against him at a subsequent murder *582 trial if the victim died.[3] As support for his claim, defendant includes an affirmation from plea counsel in which counsel avers in pertinent part that he never informed defendant that, if the victim died and the prosecuting authority brought murder charges, his plea allocution could be used against him at a trial on a murder charge.[4] (See plea counsel affirmation f 4 attached as exhibit C to defendant’s motion.) Defendant also includes his own affidavit in which he registers his belief that his plea and sentence ended all litigation with respect to his case and claims that he was not informed to the contrary. (See aff of Carlos Carromero H 3, 4 attached as exhibit D to defendant’s motion.) Further, defendant states that he would never have pleaded guilty had he known that he could be subsequently prosecuted for murder if the victim died. (See aff of Carlos Carromero f 4.)
With respect to both a trial court’s and an attorney’s constitutional obligation to ensure that before pleading guilty a defendant has a full understanding of the consequences of his or her plea, the appellate courts have drawn a distinction between direct consequences — of which the defendant must be advised, and collateral consequences — of which the defendant need not be advised.[5] A direct consequence is one which has a definite, immediate and largely automatic effect on a defend *583 ant’s punishment, whereas a collateral consequence is one peculiar to the individual’s personal circumstances and generally results from actions taken by agencies the court does not control. (See People v Peque, 22 NY3d 168, 184 [2013]; People v Ford, 86 NY2d 397 [1995].) Examples of direct consequences include: the forfeiture of trial rights; the imposition of a mandatory term of imprisonment; and the imposition of mandatory postrelease supervision. Examples of collateral consequences include: the loss of the right to vote, the right to travel abroad, the right to gain civil service employment, and the right to possess firearms; an undesirable discharge from the Armed Services; the imposition of a prison term upon revocation of postrelease supervision; sex offender registration under the Sex Offender Registration Act; and civil confinement under the Sex Offender Management and Treatment Act. (People v Peque, 22 NY3d at 184-185.)
Here, defendant concedes that counsel’s failure to apprise him that his plea could be used against him at a subsequent trial is a collateral consequence of his plea to attempted murder in the second degree. (See defendant’s motion at 5, 10.) Even assuming, arguendo, that defendant had not made such a concession, the court still would have concluded that the use of defendant’s plea allocution at a subsequent trial is a collateral consequence of pleading guilty. This is so because the use of defendant’s plea allocution is not an automatic, immediate or definite consequence of defendant’s plea or punishment. Indeed, the use of defendant’s plea allocution is dependent upon the occurrence of two contingencies: (1) the death of Mr. Pugh, which occurred oyer 27 years after defendant pleaded guilty to attempted murder, and (2) the decision of the Bronx District Attorney’s Office to prosecute defendant for Pugh’s murder. Under these circumstances, where the plea and consequence are so attenuated in time and likelihood, no counsel or court could be expected to foresee that defendant’s plea allocution might be used against him in a subsequent murder trial and to inform *584 him of that possibility. (See Murden v Artuz, 253 F Supp 2d 376, 381-382 [ED NY 2001], affd 60 Fed Appx 344 [2d Cir 2003] [court denied petition for a writ of habeas corpus and ruled that due process does not require either counsel or the court to foresee that defendant’s plea allocution in which he admitted to arson charge might be used against him in a subsequent murder trial and to inform him of that possibility where the victim died two years after she sustained fire-related injuries].)[6] Because this particular consequence of defendant’s plea is a collateral consequence, it falls outside the Sixth Amendment and counsel had no constitutional duty to apprise defendant of it.[7]
Defendant’s reliance upon Padilla v Kentucky is misplaced. Initially, defendant overstates the Supreme Court’s ruling in Padilla. Having conceded that the use of defendant’s plea allocution at a subsequent prosecution is a collateral consequence, defendant cites Padilla for the proposition “that counsel must warn clients of potential adverse collateral consequences before accepting guilty pleas.” (See defendant’s motion at 6.) However, Padilla makes no such pronouncement. In Padilla, in determining that counsel is constitutionally required to apprise her client of the immigration consequences of a plea (when those consequences are succinct, clear and explicit), the Court relied on the sui generis nature of deportation — the severity of the penalty and the automatic way it follows from conviction — to show that the collateral versus direct distinction *585 was ill-suited to dispose of Padilla’s claim. (See Chaidez, 568 US at —, 133 S Ct at 1112.) Similarly, in People v Peque, the Court of Appeals struggled to find a home for deportation in the direct/collateral divide. In Peque, in determining that a trial court is constitutionally required to apprise non-citizen defendants of the possibility of deportation prior to entering a guilty plea, the Court found that although deportation is “technically on the collateral side of the direct/collateral divide” it fell within a rare case exception to the usual rule that, if collateral, there is no constitutional duty on a trial court to apprise. (See People v Peque, 22 NY3d at 192.) In holding that due process still requires a trial court to warn defendant of the immigration consequences of his or her plea, the Court emphasized the “truly unique nature of deportation as a consequence of a guilty plea” and explicitly stated, “there is nothing else quite like it.” (Id. at 196.) Thus, if there is one thing that Padilla and Peque actually make clear, it is that deportation is a sui generis consequence of a plea, and thus, contrary to defendant’s assertion, neither case has extended categorically an attorney’s or a trial court’s duty to apprise a defendant of all adverse collateral consequences of a guilty plea.
The use of defendant’s plea allocution at a subsequent trial is not so unique that it should be addressed by trial courts and counsel in the same way as deportation. There is nothing inherent in a plea allocution acknowledgment of guilt that removes a defendant’s statement from the general category of admissions. While the case at bar exhibits an unusual use of these admissions in that the second crime is so closely related to the first, the circumstances under which plea admissions may be used are not uncommon. For example, a defendant’s statements during his plea allocution can be admitted to impeach him in a subsequent prosecution of a codefendant in the event that defendant testifies inconsistently with his plea allocution. Unquestionably, the use of defendant’s factual admissions at the instant murder trial is, as defendant puts it, “very serious,” if not “devastating” evidence of defendant’s guilt. However, as stated above, the use of defendant’s plea allocution is unrelated to an automatic punishment. Moreover, the likelihood that defendant’s plea allocution would be used at a subsequent murder trial can be aptly characterized as remote as it is dependent upon the victim’s death and the prosecution’s election to bring murder charges. Thus, unlike deportation, the subsequent use of a plea allocution does not fall within the *586 ambit of the Sixth Aanendment right to effective assistance of counsel.[8] (Compare Padilla, 559 US at 366.)
Even assuming that the Federal or New York State Constitution imposes a duty upon counsel or the trial court to warn defendant with respect to this particular consequence of his plea, or even assuming that plea counsel misadvised defendant regarding the subsequent use of his factual admissions, defendant’s motion still would fail as he has not established a reasonable probability that he would not have pleaded guilty if warned by counsel that his plea allocution could be used at a subsequent trial for murder. Although defendant avers that had he known of the potential prosecution, he would not have pleaded guilty, the favorable sentence he received pursuant to his plea undermines the credibility of this statement. Had he gone to trial and been convicted of both attempted murder in the second degree and bribery in the second degree, defendant faced consecutive terms that could expose him to twice the sentence he was promised under the plea agreement. Thus, it is no surprise that defendant chose to plead guilty. The court therefore rejects as not credible defendant’s claim that he would not have pleaded guilty had he known that his plea allocution could be used against him at a subsequent murder trial. To the contrary, defendant has failed to establish that he was prejudiced by the absence of this advice in plea counsel’s representation.
Accordingly, defendant’s motion is denied.

. Defendant also admitted to the burglary charge, but apparently sometime after pleading guilty the indictment was dismissed based upon the defense of infancy.

. The court notes that defendant has mistakenly filed the instant motion under indictment No. 3488/13, which charges him with murder in the second degree. However, it is obvious that defendant is seeking to vacate his plea and conviction with respect to indictment No. 4283/85 under which he pleaded guilty to attempted murder in the second degree and bribery in the second degree. Thus, the court has amended the indictment number on both defendant’s motion and the People’s response to accurately reflect the relief requested.

. Defendant’s sole claim for vacatur is based upon his Sixth Amendment right to the effective assistance of counsel. Defendant does not claim that the court’s failure to warn him of this potential consequence of his plea rendered his plea involuntary and in violation of his Fifth Amendment right to due process. However, because the two issues — whether a plea is voluntary and whether defendant received the effective assistance of counsel — are “closely linked,” had defendant raised a claim with respect to the former issue, the court would have used the same analytical framework detailed below to deny this claim. (See People v Peque, 22 NY3d 168, 200 [2013].) Additionally, this claim would be denied because it is record-based and thus could have been raised on direct appeal. (See CPL 440.10 [2] [c]; People v Simpson, 120 AD3d 412 [1st Dept 2014].)

. Plea counsel also avers that he informed defendant that the plea agreement would end his prosecution and that there would be no further prosecution. Significantly, defendant bases his ineffective assistance claim solely upon counsel’s failure to advise and does not claim that counsel gave him misadvice or misinformation regarding the use of his plea allocution at the instant murder trial.

. In People v Peque (22 NY3d at 196), a sharply divided Court of Appeals most recently reaffirmed the direct/collateral framework for analyzing the scope of a trial court’s duty to warn defendant of the consequences of pleading guilty and strongly suggested that this rubric is useful, if not required, when analyzing the scope of an attorney’s obligation to inform her client of the consequences of pleading guilty. Likewise, in Padilla v Kentucky (559 *583 US 356 [2010]), the Court, while struggling with how to classify deportation, strongly suggested that the direct/collateral framework was viable for analyzing a Sixth Amendment claim of ineffective assistance of counsel and that if a consequence of a criminal conviction is collateral it is removed from the ambit of the Sixth Amendment’s right to counsel. (See Chaidez v United States, 568 US —, —, —, 133 S Ct 1103, 1108, 1112 [2013] [in Padilla, although the Court found the direct/collateral framework ill-suited to classify deportation, the Court stated that it “did not eschew the direct-collateral divide across the board”].)

. Indeed, both defendant’s and counsel’s averments provide further evidence that the use of defendant’s plea allocution was unforeseeable inasmuch as they state that they believed that defendant’s plea would end all criminal proceedings against defendant with respect to the shooting of Pugh. (See Carromero aff 1 3; Slovis aff 1 4.)

. People v Latham (234 AD2d 864 [3d Dept 1996]) does not require a different conclusion. In Latham, the Third Department ruled that the trial court erred in permitting the prosecution to introduce defendant’s plea admissions to attempted murder at a subsequent murder trial. The ruling was premised upon the Court’s determination that use of a plea allocution at a subsequent trial is a direct consequence of a guilty plea and thus a trial court has a duty to advise a defendant that his plea allocution could be used against him at a subsequent trial. (Id. at 865.) However, defendant does not argue that this ruling is binding precedent and even concedes that the instant consequence of defendant’s plea is a collateral consequence. Even had defendant relied upon the Third Department’s ruling, I would have concluded that it is not controlling authority on this issue because the Third Department’s decision was reversed on other grounds by the Court of Appeals, thus rendering the language in the Third Department’s decision that this particular consequence is a direct consequence of a plea mere dicta. (See People v Latham, 90 NY2d 795 [1997].)

. Because this consequence of defendant’s plea falls outside the Sixth Amendment, there is no duty on counsel to apprise defendant of it and it is unnecessary to reach the issue of whether defendant was prejudiced by counsel’s deficient performance. (See People v Verdejo, 109 AD3d 138 [1st Dept 2013].)