# Illinois Official Reports

## Appellate Court

---

### *People v. Dominguez*, 2016 IL App (2d) 150872

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE A. DOMINGUEZ, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0872 |
| Filed | October 18, 2016 |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 12-CF-230, 13-CF-219; the Hon. Sharon L. Prather, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Francisco J. Botto, of Botto Gilbert Gehris Lancaster, P.C., of Crystal Lake, for appellant.<br><br>Louis A. Bianchi, State's Attorney, of Woodstock (Lawrence M. Bauer and Marshall M. Stevens, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justice Burke concurred in the judgment and opinion.<br>Justice Hutchinson specially concurred, with opinion. |

**OPINION**

¶ 1    Defendant, Jose A. Dominguez, appeals from the denial of his petition for postconviction relief. He asserted that, prior to his guilty pleas in two cases, counsel had failed to adequately discuss the possible adverse immigration consequences of the pleas and that as a result, under *Padilla v. Kentucky*, 559 U.S. 356 (2010), counsel was ineffective. Defendant does not challenge the court's ruling that his petition was too late as to the earlier of the two cases. We affirm the petition's denial, holding that, under the branch of the *Padilla* standard that applies when "the law [was] not succinct and straightforward," counsel here needed do no more than advise defendant that the pleas might "carry a risk of adverse immigration consequences." *Padilla*, 559 U.S. at 369. We conclude that the record shows that defendant was adequately alerted to the possibility of adverse immigration consequences.

¶ 2                                    I. BACKGROUND

¶ 3    Defendant sought relief from the guilty pleas he entered in two cases, No. 12-CF-230 and No. 13-CF-219. The issues in the appeal arise primarily from the second case, in which a grand jury returned a four-count indictment against defendant.

¶ 4    The charges in that second case were one count of armed violence (720 ILCS 5/33A-2(a) (West 2012)) predicated on aggravated battery (720 ILCS 5/12-3.05(c) (West 2012)) (battery causing bodily harm on a public way, the weapon being a baseball bat—a category III weapon); two counts of aggravated battery (720 ILCS 5/12-3.05(a)(1), (c) (West 2012)) (battery causing great bodily harm, battery on a public way); and one count of mob action (720 ILCS 5/25-1(a)(1) (West 2012)) (knowing use of force or violence by two or more persons to inflict injury). The charges related to an incident that occurred on January 26, 2013, in which Patrick R. Heubner was the victim.

¶ 5    The first case, No. 12-CF-230, arose from a March 13, 2012, incident in which one person in a group of three threw a rock that went through a car window, striking an occupant of the car. In that incident, defendant was charged with four counts of mob action, one count of criminal damage to property under $300 (720 ILCS 5/21-1(a)(1), (d)(1)(B) (West 2012)), and one count of endangering the life of a child—a passenger in the car (720 ILCS 5/12C-5(a) (West 2012)).

¶ 6    Defendant had retained counsel—the same person—in both cases.

¶ 7    On December 3, 2012, defendant entered a guilty plea in case No. 12-CF-230 under a fully negotiated agreement; he pled guilty to criminal damage to property, with an agreed sentence of one year's conditional discharge and a fine of $500. Defendant did not receive an admonition of possible immigration consequences in that case.

¶ 8    On June 13, 2013, after a conference under Illinois Supreme Court Rule 402 (eff. July 1, 2012), defendant entered a guilty plea in case No. 13-CF-219. The State agreed to dismiss all counts except the first, armed violence. It further agreed not to petition to revoke defendant's conditional discharge. The court told defendant that armed violence was "a Class 2 felony with a sentencing range of three to seven years ***, fines not to exceed $25,000, and two years mandatory supervised release," and it further admonished him that there was no agreement about his sentence. According to the factual basis, defendant, while on a public way, struck

- 2 -

Heubner with a baseball bat, causing him injury. Again, the court did not admonish defendant of the possibility of immigration consequences of his plea.

¶ 9 Defendant's sentencing hearing took place on August 7, 2013. The State presented evidence of defendant's affiliation with the Latin Kings: he wore gang colors, had been photographed making gang signs, and had gang-associated tattoos. The court noted that defendant had "one of the worst past histories that the Court has seen based upon the amount of arrests and contacts." The court imposed two years' intensive probation, 180 days in jail, 200 hours of public-service work, and other conditions.

¶ 10 On January 29, 2015, defendant filed a petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 et seq. (West 2014)). New retained counsel filed the petition for him; the petition largely duplicated an earlier petition for postjudgment relief that his immigration counsel had filed. Defendant stated that he was born in Mexico but that his parents had brought him to the United States when he was eight months old and he had not been to Mexico since. As a result of his armed-violence conviction, he was facing deportation. He asserted that, because his guilty-plea counsel had failed to advise him that the conviction would likely result in his deportation, counsel's assistance had fallen below the effectiveness standard set out in *Padilla*.

¶ 11 The petition was ambiguous as to which of the two branches of the *Padilla* standard defendant was claiming applied to guilty-plea counsel. *Padilla* addresses how the first prong of the ineffective-assistance-of-counsel standard in *Strickland v. Washington*, 466 U.S. 668 (1984), is applied to a case involving a noncitizen facing deportation as a result of a guilty plea. Under *Strickland*, a claim of ineffective assistance of counsel must satisfy two prongs. First, counsel's representation must have fallen "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Second, there must have existed "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In *Padilla*, the Supreme Court held that, to provide effective assistance to a noncitizen defendant, defense counsel must satisfy a limited but positive duty to advise the defendant of the immigration consequences of a guilty plea. The specifics of the duty depend on how clear it is that the conviction will result in deportation. "When the law is not succinct and straightforward *** a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Padilla*, 559 U.S. at 369. However, "when the deportation consequence is truly clear ***, the duty to give correct advice is equally clear." *Padilla*, 559 U.S. at 369. In *Padilla*, section 1227(a)(2)(B)(i) of title 8 of the United States Code (8 U.S.C. § 1227(a)(2)(B)(i) (2006)) explicitly made the defendant deportable as a result of his guilty plea, and thus defense counsel had an affirmative duty to correctly advise the defendant of that consequence. *Padilla*, 559 U.S. at 369-71. Defendant here asserted in his petition that counsel never warned him of the "possible deportation consequences of pleading guilty." Instead, counsel told him that his plea in the armed-violence case would allow him to return home. He further asserted that "but for his counsel's assurances he would be released after the criminal proceedings ended, [he] would not have pled guilty," and he "maintain[ed] his innocence to both offenses." He did not elaborate on his claim of innocence or his chances of success. Attached to the petition was a letter to the court from defendant. It stated that he entered the plea because he was told he would be able to go home on intensive probation and that, had he

known that the conviction would make him deportable, he would have insisted on going to trial.

¶ 12    The State filed a response to the petition, asserting, based on guilty-plea counsel's affidavit, that counsel had spoken to defendant about the deleterious immigration consequences of the conviction. Defense counsel averred that he knew that defendant "had an immigration hold" (elsewhere called an "ICE hold," because such a hold is implemented at the request of Immigration and Customs Enforcement (ICE)) before the negotiated plea and was aware that there would be possible adverse immigration consequences of the plea. He "advised and warned [defendant] about the potential consequences and possible outcomes of a plea of guilty to *** Armed Violence." Neither the response nor the affidavit specifically detailed what counsel had told defendant.

¶ 13    The matter went to an evidentiary hearing. Defendant testified that he was 21 years old and had been in the McHenry County jail for a year and nine months on an ICE hold. He was not a United States citizen but had arrived in the United States when he was eight months old. He had never been outside the United States since his arrival. At some time after his arrest in case No. 13-CF-219 but before his guilty plea, he "talked to a representative of ICE, [who] faxed [him] a paper saying [that he] had an ICE hold." "[His] understanding was [that the hold] had to do with [his] immigration status." The representative also asked him about his "affiliation," meaning his gang affiliation. He was in custody in the McHenry County jail when his family retained guilty-plea counsel to represent him. In their first meeting, via video link, he and counsel discussed the charges and the ICE hold. Counsel told him "to not worry" about the hold, a discussion that took a few seconds in a conversation lasting about half an hour. Defendant described each meeting that he had had with counsel; no further discussion of immigration consequences took place until counsel spoke to him in a holding cell to tell him that counsel and the State had a possible plea agreement. By his understanding, the terms included intensive probation, finishing his GED, and participating in anger-management classes. At that time, defendant asked what was going to happen with his ICE hold if he entered the plea. Counsel told him "to not worry about it, everything's going to be fine. I would be home." Defendant further testified that he had told counsel that he was innocent but that counsel said that he did not believe him. No more meetings took place before defendant's plea. On cross-examination, he estimated that counsel had told him three times not to worry about the ICE hold.

¶ 14    Immediately after defendant's sentencing, his custody was "switched over to" ICE, and a deportation hearing was scheduled. Defendant lost at the hearing and was on his "second appeal."

¶ 15    At no time did defendant testify that he was unaware that the conviction would make him deportable. Further, he did not testify to the position that he took in his letter to the court: that he entered the plea because he was told he would be able to go home on intensive probation and that, had he known that the conviction would make him deportable, he would have insisted on going to trial.

¶ 16    Defendant's immigration attorney testified on his behalf. She said that a conviction of armed violence would make a person "eligible for mandatory deportation." After his conviction, defendant could have waived his right to a hearing, and he would have been deported in about six weeks.

- 4 -

¶ 17 Guilty-plea counsel testified for the State. He said that, when he had a client in custody and on an ICE hold, he would "try to balance the situation of custody as opposed to facing ICE depending on what the charge is and depending on what the likelihood is of ICE maintaining their hold." Asked, "Do you inform your clients that there could be negative or adverse consequences by entering a plea of guilty[?]," counsel answered, "I certainly try to." Asked if he spoke to defendant about "potential Immigration consequences," counsel said, "Yes." Asked specifically if he advised defendant that there would be possible adverse immigration consequences of pleading guilty, counsel responded:

> "Well, we had—[defendant] was between a rock and a hard place. The offer was for intense probation with time served. The alternative would be to go to trial on a—what would have been a mandatory for him because of his record and because of the gang activities.

> And we discussed the probability of winning at trial as opposed to taking the plea. And I advised him that if he took the plea, he would at least be fighting ICE on probation as opposed to a person who is in the Department of Corrections.

> He had zero kind of choices. It was not a good situation."

¶ 18 Asked, "What specifically did you advise [defendant] on in regards to the adverse possible consequences of Immigration?" counsel responded, "I'm not sure so much as far as the adverse, but as a positive to pleading guilty and being on probation as opposed to going to trial. And my—My feeling was, as a somewhat experienced defense attorney, that they would have convicted him." Counsel continued to describe what he thought would have happened if defendant had gone to trial, and he expressed hope that immigration reform might come to defendant's aid. Asked if defendant understood what counsel told him, counsel said, "Yes. He's a sharp kid." Asked if he had ever told defendant not to worry about his immigration status, counsel responded: "No, I never said don't worry about it. I said let's take one thing at a time. First let's see where we're at with the case." He said that "[i]t would have been several" times that he talked to defendant about immigration.

¶ 19 Counsel said that defendant had initially maintained his innocence in the armed-violence incident and that, initially, counsel thought that he could call witnesses who would support defendant's claim. However, as discovery unfolded, he concluded that "we would not be able to get a not guilty verdict." He said that he never would tell a client that he did not believe him; he would tell a client that "you try the facts." He did not recall ever telling defendant not to worry—that he would be able to go home.

¶ 20 The State repeatedly tried to get counsel to say that he had advised defendant that he was at risk of deportation; counsel unequivocally testified that he had not:

> "Q. *** You did know that [defendant] had an Immigration hold, correct?

> A. Correct.

> ***

> Q. *** Specifically what did you tell him that that meant?

> ***

> Q. Did you explain to him what that meant or what the potential was?

> ***

> A. I don't recall doing that. He seemed to know as much as I did about that.

What I told him was I was hoping with the view of the Administration—current Obama Administration was taking with the ICE, that his specific situation—that he would have a better handle on the ICE judge than he would have from Department of Corrections.

\* \* \*

Q. *Did you generally speak to him about what an ICE hold meant in terms of proceeding forward with the case?*

A. *No, I did not.*

Q. Are you aware that somebody with an ICE hold can be deported?

A. Yes.

\* \* \*

Q. And are you aware that people can be deported as a result of pleading guilty to any offense?

A. Yes, yes, correct.

Q. \*\*\* Did you advise [defendant] of that?

A. I had many illegals, from petty offenses to misdemeanors to felonies, and you have to balance where you're at in the criminal law first is my advice and then worry about ICE later.

And it's depending—That's why I didn't advise going to trial where I thought there would be a guilty finding because I thought it would be harder to face the ICE judge with a prison sentence as opposed to intense probation sentence that I thought he would be doing well on.

Q. *Did you advise him that deportation was a possibility as a result of the plea?*

A. *I assumed he knew that. We didn't discuss that, no.*

Q. *Did you discuss the possible deportation with him at any time?*

A. *I don't think we ever mentioned the word deportation, but, I mean, just assumed that he was talking to me about it, he knew that was a consequence.*" (Emphases added.)

¶ 21 During defendant's cross-examination of counsel, counsel admitted that he had no independent recollection of what he said to defendant during their consultations. He agreed that defendant had denied being present during the incident that led to the armed-violence charge. Asked about his strategy, he said that his greatest concern was defendant "spending the least time in custody he could." Asked if he told defendant that he would go home after he served the jail sentence to which he agreed, counsel said that he had told defendant only that he *hoped* that defendant would go home.

¶ 22 The court issued a decision denying defendant's petition:

"The Court finds that Defendant's testimony lacks credibility and is contradicted by the testimony of [counsel] and the Court record herein. \*\*\*

[Counsel] testified at hearing that he had known Defendant for an extended period of time. He testified that he was aware that Defendant had an ICE hold placed on him and that he had spoken with Defendant about it on several occasions. He denied that he ever told Defendant not to worry about it. [Counsel] testified that he felt that the Defendant was 'between a rock and a hard place.' [Counsel] was of the opinion, based

- 6 -

upon his investigation and discovery in the case, that if Defendant went to trial, he would be convicted and if that happened, he was certain, based upon Defendant's past problems and extensive criminal history, he would be sentenced to prison. He further testified that after having participated in a 402 Conference *** with the State and the Court, he advised Defendant that if he plead [*sic*] guilty, he would have a better chance of defending against the ICE hold while on probation, then [*sic*] if he was attempting to do so while in prison. [Counsel] further testified that while he advised Defendant it would not be in his best interest to go to trial, he was always willing to do so. However, the choice to do so or not was the Defendant's to make. [Counsel] did not prohibit Defendant from proceeding to trial. Counsel gave strategic advice, Defendant listened to that advice, and Defendant chose to plead guilty.

The Court finds the testimony of [counsel] to be credible and his advice given to Defendant to be within the range of competence demanded of an attorney in criminal cases. A plea based on reasonable, competent advice is an intelligent plea, not open to attack on the grounds that counsel erred in his judgment. [Citations.] Going to trial in this case would not have spared Defendant of the effect of deportation if he were convicted, which was likely, and would also have subjected him to the possibility of a greater term of imprisonment, which was also likely. While Defendant made a bare assertion he was innocent, he offered no evidence as to a plausible defense that could have been raised at trial."

¶ 23    The court also stated that counsel had testified that "Defendant was not a U.S. citizen, but had come to this country illegally at a very early age." It ruled that defendant was no longer in custody on the criminal-damage-to-property conviction and that, as a result, the petition was too late to challenge that conviction.

¶ 24    Defendant filed a motion to reconsider, arguing that *Padilla* required counsel to tell defendant specifically that the plea would make him deportable. Defendant did not challenge the court's finding that he was an illegal immigrant. The court denied the motion, and defendant timely appealed.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, defendant argues first that the court's failure to admonish him, pursuant to section 113-8 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/113-8 (West 2012)), about the immigration consequences of his guilty plea was a basis for granting his petition. He further argues that guilty-plea counsel was ineffective because he failed to advise defendant pursuant to *Padilla* that his guilty plea would make his deportation all but inevitable: he argues that counsel could have easily learned that an armed-violence conviction usually results in mandatory deportation and that, once defendant entered his plea, "he did not have *any* chance" of avoiding deportation. (Emphasis in original.) Defendant does not challenge the court's conclusion that the attack on the criminal-damage-to-property conviction came too late.

¶ 27    The State responds that, under the rule in *People v. Guzman*, 2015 IL 118749, ¶¶ 22-32, a court's failure to give the "advisement" set out in section 113-8 does not result in a deprivation of constitutional rights so as to sustain a postconviction petition. As to the *Padilla* claim, the State argues that counsel's testimony made clear that he discussed the immigration consequences of a guilty plea, that counsel's advice was not demonstrably wrong, and that, in

any event, defendant failed to demonstrate prejudice. It argues that here, and in contrast to the facts in *Padilla*, it was *not* clear that the conviction would subject defendant to mandatory deportation.

¶ 28    In his reply, defendant concedes that a failure to give section 113-8 admonishments is not an independent basis for reversal, but he argues that the lack of the admonishments makes the lack of proper advice more likely to be prejudicial. On the issue of which branch of the *Padilla* standard applies, defendant, citing section 1227(a)(2)(A), asserts, "A quick perusal of federal immigration law would have told [counsel] that [defendant's] pleas would make him eligible for deportation under at least two categories—aggravated felonies, and crimes involving moral turpitude."

¶ 29    We affirm the denial of the petition. As we noted above, *Padilla* sets out different standards for guilty-plea counsel representing a noncitizen, depending on whether deportation is a truly clear consequence of the plea. We hold that, here, "the law [was] not succinct and straightforward," and therefore counsel "need[ed] do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Padilla*, 559 U.S. at 369. The ICE hold here alerted defendant to the general risk of adverse immigration consequences, leading defendant to raise the issue with counsel, who responded in a manner that acknowledged the risk.

¶ 30    The court here denied defendant's petition at the third stage of postconviction proceedings, after an evidentiary hearing. In the third stage of proceedings, as in the second stage, the defendant has the burden of making a substantial showing of a constitutional violation. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). When a court denies a postconviction petition after an evidentiary hearing that required the court to make findings of fact and credibility determinations, our review of the decision is for manifest error. *People v. English*, 2013 IL 112890, ¶ 23. However, when the issues are purely ones of law and do not turn on special knowledge of the trial, our review is *de novo*. *Pendleton*, 223 Ill. 2d at 473.

¶ 31    The substantive issue here is whether counsel's advice was what was required by *Padilla*. The parties dispute which of the two branches of the *Padilla* standard applies. Defendant asserts that armed violence is clearly both an aggravated felony and a crime involving moral turpitude such that it was truly clear that under section 1227(a)(2) defendant became deportable by virtue of his guilty plea. The State implies that the result is truly clear only when section 1227(a)(2) explicitly lists the offense at issue. Case law indicates that, where counsel can determine by limited research beyond the text of section 1227(a)(2) that an offense makes an alien deportable, the effect of the conviction remains truly clear. *E.g.*, *People v. Valdez*, 2015 IL App (3d) 120892, ¶ 22; *State v. Gaitan*, 37 A.3d 1089, 1113 (N.J. 2012). Defendant has not shown that the consequences were clear. Indeed, he has completely failed to explain the analysis that leads to his conclusion that deportation was a "truly clear" (*Padilla*, 559 U.S. at 369) consequence of his plea.

¶ 32    A conviction of an "aggravated felony" makes an alien deportable. 8 U.S.C. § 1227(a)(2)(A)(iii) (2012). From section 1101(a)(43)(F) (8 U.S.C. § 1101(a)(43)(F) (2012)), we learn that an "aggravated felony" includes "a crime of violence (as defined [in another section] ***) for which the term of imprisonment at [*sic*] least one year." From the cited section, we learn that a "crime of violence" includes "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 16(a) (2012). "Physical force" means "*violent* force," so that armed violence

predicated on aggravated battery is a crime of violence, but only when the predicate battery was battery causing bodily harm. (Emphasis in original and internal quotation marks omitted.) *United States v. Fish*, 758 F.3d 1, 9 (1st Cir. 2014) (an offense with elements satisfied by mere touching is not a violent crime). However, that does not address the requirement that the term of imprisonment be a year or more; it appears that the relevant term is the term actually imposed, not the statutorily available sentence. *Valdez*, 2015 IL App (3d) 120892, ¶ 18 (citing *United States v. Guzman-Bera*, 216 F.3d 1019, 1021 (11th Cir. 2000)).

¶ 33        A crime involving moral turpitude (CIMT) can make an alien deportable if, among other things, it is an offense "for which a sentence of one year or longer may be imposed." 8 U.S.C. § 1227(a)(2)(A)(i)(II) (2012). "Moral turpitude is a notoriously difficult phrase to define." *Valdez*, 2015 IL App (3d) 120892, ¶ 21. According to a Board of Immigration Appeals discussion quoted as persuasive in *Ceron v. Holder*, 747 F.3d 773 (9th Cir. 2014):

> " '[A] finding of moral turpitude involves an assessment of both the state of mind and the level of harm required to complete the offense. Thus, intentional conduct resulting in a meaningful level of harm, which must be more than mere offensive touching, may be considered morally turpitudinous. However, as the level of conscious behavior decreases, i.e., from intentional to reckless conduct, more serious resulting harm is required in order to find that the crime involves moral turpitude. Moreover, where no conscious behavior is required, there can be no finding of moral turpitude, regardless of the resulting harm.' " *Ceron*, 747 F.3d at 783 (quoting *In re Solon*, 24 I. & N. Dec. 239, 242 (B.I.A. 2007)).

The offense is analyzed categorically; the analysis is of the statute defining the offense and not of the facts of the underlying conviction. *Ceron*, 747 F.3d at 780. We will not proceed further with this analysis; as should now be clear, it could not possibly be deemed straightforward. Moreover, neither party has explained how the analysis would proceed for an offense like armed violence, whose character changes greatly depending on the predicate offense. One logical result would make whether the offense is a CIMT turn on whether the predicate battery underlying the armed-violence conviction involved bodily harm, but that result is in no way obvious.

¶ 34        Based on these analyses, we conclude that the immigration consequences of defendant's conviction were *not* truly clear. Thus, counsel's only obligation under *Padilla* was to warn defendant of possible adverse immigration consequences. We deem counsel to have met that obligation. Defendant's questions to counsel show that defendant was already aware of the possibility of deportation—he could scarcely have avoided such awareness, given the ICE hold. To satisfy his duty, then, counsel needed only to agree with defendant's conclusion that deportation was a concern. Accepting as we must the trial court's determinations of fact, counsel did this. The court found that counsel told defendant that he would have a better chance defending against "the ICE hold" while on probation than in prison. Although counsel would have more clearly met his obligation if he had discussed defending against *deportation*, he nevertheless acknowledged that defendant was facing significant immigration difficulties. Moreover, counsel's desire to get a sentence of probation had a reasonable legal basis. The sentence actually imposed might have determined whether defendant was convicted of an aggravated felony. Given the complexity of the CIMT analysis, avoiding that clear basis for deportation was a reasonable consideration.

¶ 35    Because defendant failed to show that counsel's representation fell below an objective standard of reasonableness under the applicable branch of the *Padilla* standard, defendant failed to meet his burden of proving that counsel was ineffective. The trial court thus did not err in denying his postconviction petition.

¶ 36                                  III. CONCLUSION

¶ 37    For the reasons stated, we affirm the denial of defendant's postconviction petition. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2014); see also *People v. Nicholls*, 71 Ill. 2d 166, 179 (1978).

¶ 38    Affirmed.

¶ 39    JUSTICE HUTCHINSON, specially concurring.

¶ 40    I concur in the analysis and outcome of the majority opinion in this case. I write separately to remind the lawyers who choose to travel through these immigration minefields that state law and federal law are miles apart in both substance and procedure where immigration matters are concerned.

¶ 41    First and foremost, the lawyer must be familiar with the Illinois Rules of Professional Conduct of 2010. In particular, the Preamble states:

> "As a representative of clients, a lawyer performs various functions. As advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications. *** As an evaluator, a lawyer acts by examining a client's legal affairs and reporting about them to the client or to others." Ill. R. Prof'l Conduct (2010) pmbl.

Furthermore, Rule 1.1, which pertains to competence, requires that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." Ill. R. Prof'l Conduct (2010) R. 1.1 (eff. Jan. 1, 2010). The comment on legal knowledge and skill notes that "[i]n determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience, [and] the lawyer's training and experience in the field in question." Ill. R. Prof'l Conduct (2010) R. 1.1, cmt. 1 (eff. Jan. 1, 2010).

¶ 42    Based upon the complexity of most immigration matters, attorneys not otherwise trained or knowledgeable in immigration law should beware. See, *e.g.*, *In re Winthrop*, 219 Ill. 2d 526 (2006). A criminal charge at the state level adds another layer to an immigration case, and the cases cited by the majority reveal issues in such cases that could well encourage nightmares during an otherwise peaceful sleep.

¶ 43    How can such cases be better handled by counsel and the courts? Consultation with an immigration attorney before the plea is entered is an excellent idea. A better practice might be to advise a client in writing (in the client's primary language) that consultation with an immigration attorney is recommended and to likewise request a response from the immigration attorney in writing as well. At a minimum though, to meet their responsibilities as advisor,

evaluator, and advocate, attorneys should create complete profiles of those seeking their professional assistance.

¶ 44     As for the courts, while negotiated pleas are essential to the orderly administration of justice, finality of cases is just as essential. If there is any question about the defendant's nationality, counsel should be asked during the presentation of the plea whether he or she has talked to the defendant about possible deportation as a result of the plea. An answer of "no" may delay the plea or even be a basis to set the matter for trial. However, if the answer is "yes," a record has been made and subsequent proceedings might not be needed or might be minimized in scope.

¶ 45     This is not an issue that is likely to go away anytime soon. Solutions need to be explored to ensure the efficient and fair administration of justice in all cases.