RENDERED: JUNE 24, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0553-MR

JOSEPH EBU                                           APPELLANT


v.                APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE JULIE M. GOODMAN, JUDGE
ACTION NO. 15-CR-01061


COMMONWEALTH OF KENTUCKY                      APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, CALDWELL, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE: Joseph Ebu appeals from the order of the Fayette Circuit Court denying his motion to set aside his plea after the circuit court conducted an evidentiary hearing on Ebu's ineffective assistance of counsel claim pursuant to Kentucky Rules of Criminal Procedure (RCr) 11.42. Ebu argues his trial counsel was ineffective by failing to advise him on the effect his guilty plea to two misdemeanors would have on his immigration status pursuant to *Padilla v.*

*Kentucky*, 559 U.S. 356, 366, 130 S.Ct. 1473, 1482, 176 L.Ed.2d 284 (2010). Ebu argues his counsel was obligated to research crimes involving moral turpitude and advise him that pleading to theft and fraudulent conduct made him deportable. We affirm because we believe that counsel was not acting ineffectively by advising Ebu that there could be immigration consequences to his plea and that he should consult with an immigration attorney.

This case was before us previously in 2019 when Ebu challenged the summary denial of his motion to set aside his plea. We provide the relevant facts as summarized in his previous appeal:

> Ebu was indicted by the Fayette County Grand [J]ury of theft by deception including cold checks under $10,000 and theft of identity of another without consent, both Class D felonies. The charges arose from Ebu's alleged involvement with the fraudulent purchases of mobile phones using stolen identities.
>
> On June 9, 2017, on advice of counsel, Ebu entered guilty pleas to amended charges of facilitation to theft by deception and fraudulent use of a credit card, both misdemeanors. He was sentenced to twelve months on each of the two misdemeanors, to run concurrently, with the imposition of the sentence of imprisonment probated for two years.
>
> On October 4, 2017, Ebu filed an RCr 11.42 motion along with a verified affidavit requesting that he be permitted to set aside his guilty pleas on the basis he received ineffective assistance of counsel in the form of affirmative misadvice from his former counsel about the immigration consequences of his plea and sentence. Specifically, Ebu stated his former counsel advised him

-2-

he would not be deported if he pled guilty to the misdemeanors. At this point, Ebu had been seized by immigration and deportation procedures had started.

On October 26, 2017, the Fayette Circuit Court summarily denied Ebu's motion to set aside indicating that it reviewed the video record of Ebu's guilty plea and sentencing. Ebu's motion to reconsider was denied[.]

*Ebu v. Commonwealth*, No. 2017-CA-002035-MR, 2019 WL 6245351, at *1 (Ky.App. Nov. 22, 2019) (unpublished). After reviewing the relevant law, we reversed and remanded for an evidentiary hearing as Ebu had presented material factual allegations of ineffective assistance of counsel that were not refuted by the record. *Id.* at *2-3.

On February 12, 2020, the circuit court held an evidentiary hearing. Ebu, his mother, and his trial counsel testified.

Trial counsel testified he met with Ebu several times about his case and was aware of Ebu's legal status as a legal resident in the United States. Trial counsel denied that Ebu's mother attended all of his meetings with Ebu, explaining she attended more of them at the beginning.

Trial counsel testified he does not practice immigration law and did not feel he was in a position or qualified to give immigration advice, knew just enough to be dangerous, and did not advise Ebu on crimes of moral turpitude. Instead, knowing that Ebu's family had an immigration attorney, trial counsel explained he consistently advised Ebu to speak to that immigration attorney.

-3-

Trial counsel expressed he believed Ebu's pleading guilty to misdemeanors was the best trial counsel could do but admitted there was not much time for Ebu to decide on whether to take the latest plea deal as the offer came in on a Friday and the trial was scheduled for the following Monday. Trial counsel also explained he thought it would be better for Ebu's immigration status for Ebu to be convicted on misdemeanors rather than felonies but told Ebu that he could still face possible deportation.

Trial counsel stated Ebu did have a credible defense; it was not a case where there was no hope, but it would be a hard case to win. Trial counsel explained that Ebu's defense would have been that he was a low-level member of a criminal organization and was an innocent mule who collected packages and mailed them to Ghana in the attempt to do a favor for his friend. While trial counsel admitted Ebu was a member of WhatsApp chats found on his phone by the police regarding stolen credit card numbers, trial counsel stated there was no proof that Ebu had looked at any of those chats, there was no proof Ebu had used any of the credit card numbers, Ebu had no criminal record, and trial counsel believed Ebu would make a credible witness. Trial counsel explained that if he had taken the case to trial, he would have hoped for an acquittal or a hung jury.

Trial counsel admitted not knowing if avoiding felony convictions was key for avoiding deportation, but thought if Ebu were deported that maybe he

could reenter the country with misdemeanor convictions and feared if Ebu was convicted of felony offenses that he would be deported for sure. Trial counsel expressed that in some cases he does some research about deportation but did not do that in this case because he thought it would be better for Ebu to speak with his family's immigration attorney, and stated he suggested that Ebu speak to that immigration attorney several times. However, trial counsel noted he never got the impression that Ebu talked with an immigration attorney.

During his testimony, the following exchange took place regarding trial counsel's uncertainty about what would happen with Ebu's immigration status post-plea:

> Q: In looking at the record, probation in most circumstances would be a good deal. Do you feel, looking back on it now, that you should have done more?
>
> A: Had I known that they were going to come in and take [Ebu] because of that plea, I wouldn't have done the plea. I mean, I think [Ebu], we both, would have said "let's take our chances" if we'd known with certainty, we just had no way of knowing with certainty, but if we'd known he was going to be deported with certainty, I don't think [Ebu] would have. I think I would have rather had misdemeanors, but if he's going to be deported, and that's important to him and his family, I think he'd been in the country about four years when this had happened, if I had known with certainty, we wouldn't have done the plea.

Trial counsel explained he did not tell Ebu he would be deported by taking the plea but told him he could be deported. Trial counsel hoped that Ebu would not be deported, but believed the plea was the best Ebu could get.

Ebu testified he left Ghana after his grandfather died because he and his sister had nowhere to go. He stated his uncle was poisoned and killed due to his Jewish faith.

Ebu testified his biggest concern was about being deported and he had no idea he would face deportation for a misdemeanor and had previously turned down an offer of one-year probation for a felony, and then a misdemeanor conviction with two months in jail, as it would have interfered with his college term. Ebu explained trial counsel told him he was facing mandatory deportation if convicted of the felonies but told him that misdemeanors would be okay for his immigration status. Ebu denied that trial counsel had ever told him to contact an immigration attorney for advice.

As to the specific plea offer he accepted, Ebu stated he was called on a Friday and told to come to Lexington to plead guilty that day, with trial counsel telling him that it was a good deal for him. Ebu stated trial counsel had told him his chances at trial were about fifty-fifty, but Ebu insisted he would have gone to trial instead of pleading if he had known he would be deported. Ebu explained that being deported was like a "gun to his head" and he would have seen if he could

have gotten acquitted. Ebu stated while he knew his mother had an immigration lawyer that did her citizenship and had advised her to bring him to the United States, Ebu had never met him.

Ebu testified he found out he would be deported when he went to visit his probation officer and Immigration and Customs Enforcement (ICE) was waiting to pick him up. At that time, he was told that his plea affected his green card. He explained he has remained in ICE detention since that time.

Ebu's mother testified she attended all of Ebu's meetings with trial counsel. She stated that trial counsel never advised Ebu to speak to her immigration attorney and that Ebu never spoke to an immigration attorney.

The parties filed post-hearing briefs. Ebu argued trial counsel was deficient when he failed to advise Ebu that he *would be deported* after pleading guilty to two misdemeanors, noting that under *Padilla* that "[w]hen deportation consequences are clear, the duty to give correct advice is equally clear." Ebu then argued that the one thing that was clear from trial counsel's testimony is that he did not know that Ebu would be deported and trial counsel's "failure to research and lack of knowledge of the law fell below the objective standard of reasonableness under the prevailing professional norms." Relying on the unpublished case of *Pierre v. Commonwealth*, No. 2012-CA-001038-MR, 2014 WL 5064169 (Ky.App. Oct. 10, 2014) (unpublished), Ebu argued that similar advice to what he was given

was "vague and incomplete" and, therefore, deficient. Ebu argued that 8 United States Code (U.S.C.) § 1227(a)(2)(A)(i)(I)-(II)[1] is "clear and explicit" that "any alien who is convicted of a crime of moral turpitude within five years after date of admission, and is convicted of a crime for which a sentence of one year or long[er] may be imposed is deportable." Ebu indicated that "theft and fraud" are crimes of moral turpitude and stated that "[a] legal inquiry into Westlaw shows multiple cases of crimes considered to be of moral turpitude which result in deportation." Ebu then argued that if he had been convicted of a crime involving moral turpitude for which the maximum sentence possible would be less than one year, he could have avoided deportation; therefore, he was prejudiced by his trial counsel failing to negotiate a plea deal with less than one year to serve if he violated probation.

Ebu also argued he was prejudiced because he was deprived of a right to a trial, which both Ebu and trial counsel would have insisted upon had they known that Ebu would be deported based on his plea. Ebu argued it would have been rational for him to insist on going to trial as he had a legitimate defense that he was also a victim of this scheme, was an unknowing "mule," has no family left in Ghana, and fears religious persecution if he is returned to Ghana.

---

[1] This provision is contained in the Immigration and Nationality Act (INA) § 237(a)(2)(A)(i)(I) and referred to as such by immigration courts. We refer to the U.S.C. rather than the INA for all our citations.

Ebu attached the decision of the immigration judge in his immigration case which concluded that Ebu is removable because his misdemeanor convictions qualify as crimes involving moral turpitude:

> The Court finds that the respondent's convictions under [Kentucky Revised Statutes (KRS)] 434.540 [sic] and KRS 514.040, which explicitly require an intent to defraud and an intent to deprive another by deception, respectively, necessarily involve turpitudinous conduct. *See Marin-Rodriguez v. Holder*, 710 F.3d 734, 738 (7th Cir. 2013) ("Crimes entailing an intent to deceive or defraud are unquestionably morally turpitudinous."); *see also Arias v. Lynch*, 834 F.3d 823, 826-29 [(7th Cir. 2016)] (opining that, while fraud remains morally turpitudinous, simple dishonesty may not). The respondent's counsel has not argued that either statute contains overbroad, non-turpitudinous conduct. Nor has he shown a realistic probability of prosecution for such conduct.

In the circuit court's order, the court implicitly made a credibility finding in favor of trial counsel, rather than Ebu and his mother, largely adopting trial counsel's testimony over theirs when they conflicted, finding as follows:

> Counsel represented Mr. Ebu for over two years during which time he met with Mr. Ebu approximately seven or eight times where he discussed the possible outcome of his client's case. Trial counsel further testified that during those meetings he advised Mr. Ebu he could be convicted of two Class D Felonies, and discussed the adverse consequences of such a conviction to his college education, his immigration status, and his employment. Additionally, counsel advised Mr. Ebu that he was not an immigration attorney and that he should contact his immigration attorney regarding what consequences a plea result could have on his immigration

status.  Counsel advised Mr. Ebu that a misdemeanor plea could result in deportation but advised that a misdemeanor plea was better than a felony conviction sentence of up to five years [for] his future, and possibly his immigration status.  Trial Counsel further testified that he advised Mr. Ebu to take the misdemeanor offer believing that this was his best chance to remain in the United States and out of the penitentiary.  He based his advice knowing that there was no guarantee of a not guilty verdict at trial based on all the facts of his case and the undisputed physical evidence of the crimes found in Mr. Ebu's possession.

The circuit court determined that based on the strong evidence against Ebu, the testimony of the parties, and the fact that counsel advised Ebu of his potential deportation if he pled, there was no error and no deficient representation. The circuit court explained that counsel advised Ebu "of the possible adverse consequences a plea could have on his education, his future employment, and his possible immigration status" and "to contact his immigration attorney."

The circuit court also determined that Ebu was not prejudiced by the advice to accept the plea offer.  The circuit court explained that Ebu was charged with two Class D felonies and was facing sentences of one to five years in the penitentiary on each, with collateral consequences of being a convicted felon.  The circuit court noted that trial counsel assessed Ebu's trial chances at fifty-fifty and advised Ebu that based on the evidence and the misdemeanor offer that he should accept, and Ebu in fact was sentenced to concurrent twelve months on each of the misdemeanors, given the opportunity to have that sentence probated for two years,

and avoided the collateral consequences of being a convicted felon. Therefore, the circuit court denied Ebu's motion to set aside his guilty plea.

Ebu reiterates his argument that his plea was involuntary due to the ineffective assistance of counsel he received, because he was given inaccurate information about the effect his plea would have on his immigration status, when he should have been told that his plea would lead to his deportation for committing crimes of moral turpitude as crimes involving fraud clearly fall into that category. He argues if he had received accurate information, he would have declined to plead guilty and taken his chances with a trial.

A trial court considers the totality of the circumstances in determining whether a plea is involuntary; if the plea is involuntary, the trial court must grant the motion to withdraw the plea. *Edmonds v. Commonwealth*, 189 S.W.3d 558, 566 (Ky. 2006). "This inquiry is inherently fact-sensitive, thus this Court reviews such a determination for clear error, *i.e.*, whether the determination was supported by substantial evidence." *Id.* "If . . . the trial court determines that the guilty plea was entered voluntarily, then it may grant or deny the motion to withdraw the plea at its discretion. This decision is reviewed under the abuse of discretion standard." *Rigdon v. Commonwealth*, 144 S.W.3d 283, 288 (Ky.App. 2004).

The *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel applies to

-11-

challenges to guilty pleas. *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985).

> In such an instance, the trial court is to "consider the totality of the circumstances surrounding the guilty plea and juxtapose the presumption of voluntariness inherent in a proper plea colloquy with a *Strickland v. Washington* inquiry into the performance of counsel." To support a defendant's assertion that he was unable to intelligently weigh his legal alternatives in deciding to plead guilty because of ineffective assistance of counsel, he must demonstrate the following:
>
>> (1) that counsel made errors so serious that counsel's performance fell outside the wide range of professionally competent assistance; and (2) that the deficient performance so seriously affected the outcome of the plea process that, but for the errors of counsel, there is a reasonable probability that the defendant would not have pleaded guilty, but would have insisted on going to trial.

*Rigdon*, 144 S.W.3d at 288 (footnotes omitted) (quoting *Bronk v. Commonwealth*, 58 S.W.3d 482, 486 (Ky. 2001) and *Sparks v. Commonwealth*, 721 S.W.2d 726, 727-28 (Ky.App. 1986)).

In *Padilla*, the defendant Padilla, a permanent resident, alleged he received ineffective assistance of counsel regarding his plea of guilty to transporting a large amount of marijuana because his counsel told him that based on the amount of time he had spent in the United States, he could not be deported. Padilla argued if he had known he would be deported, he would have proceeded to trial instead of accepting a plea. *Padilla*, 559 U.S. at 359, 130 S.Ct. at 1477-78. In

-12-

reviewing the matter, the Kentucky Supreme Court rejected his argument, believing that "neither counsel's failure to advise petitioner about the possibility of removal, nor counsel's incorrect advice, could provide a basis for relief" as it was a "collateral" consequence of his conviction. *Id.* at 359-60, 130 S.Ct. at 1478. The United States Supreme Court granted *certiorari* "to decide whether, as a matter of federal law, Padilla's counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country" and "agree[d] . . . that constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation." *Id.* at 360, 130 S.Ct. at 1478. As noted by the United States Supreme Court multiple times in its opinion, "Padilla's crime, like virtually every drug offense except for only the most insignificant marijuana offenses, is a deportable offense under 8 U.S.C. § 1227(a)(2)(B)(i)." *Id.* at 359 n.1, 130 S.Ct. at 1477 n.1.

The United States Supreme Court explained its reasoning for reversing as follows:

> In the instant case, the terms of the relevant immigration statute are *succinct, clear, and explicit* in defining the removal consequence for Padilla's conviction. See 8 U.S.C. § 1227(a)(2)(B)(i) ("Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States or a foreign country relating to a controlled substance . . . , other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable").

-13-

*Padilla's counsel could have <u>easily determined</u> that his plea would make him eligible for deportation <u>simply from reading the text of the statute</u>, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses.* Instead, Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country.  This is not a hard case in which to find deficiency:  *The consequences of Padilla's plea could easily be determined from reading the removal statute*, his deportation was presumptively mandatory, and his counsel's advice was incorrect.

Immigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it.  *There will, therefore, undoubtedly be <u>numerous situations</u> in which the deportation consequences of a particular plea are <u>unclear or uncertain</u>.*  The duty of the private practitioner in such cases is more limited.  *When the law is <u>not succinct and straightforward</u> (as it is in many of the scenarios posited by Justice [Alito]), a criminal defense attorney need do no more than <u>advise</u> a noncitizen client that pending criminal charges <u>may carry a risk of adverse immigration consequences</u>.  But when the deportation consequence is <u>truly clear</u>, as it was in this case, <u>the duty to give correct advice is equally clear</u>.*

*Padilla*, 559 U.S. 356, 368-69, 130 S.Ct. at 1483 (footnotes omitted) (emphases added).

In Justice Alito's concurrence, he argued for a clear rule that was universally applicable, rather than reliance on how clear the immigration law was in a particular case.[2] He further noted:

> The Court's new approach is particularly problematic because providing advice on whether a conviction for a particular offense will make an alien removable is often quite complex. "Most crimes affecting immigration status are not specifically mentioned by the [INA], but instead fall under a broad category of crimes, such as *crimes involving moral turpitude* or *aggravated felonies*." M. Garcia & L. Eig, CRS Report for Congress, Immigration Consequences of Criminal Activity (Sept. 20, 2006) (summary) (emphasis in original). As has been widely acknowledged, determining whether a particular crime is an "aggravated felony" or a "crime involving moral turpitude" [(CIMT)] is not an easy task. *See* R. McWhirter, ABA, *The Criminal Lawyer's Guide to Immigration Law: Questions and Answers* 128 (2d ed. 2006) (hereinafter ABA Guidebook).

*Id.* at 377-78, 130 S.Ct. at 1488 (Alito, J., concurring). He provided several examples of particular crimes in which it was complicated to determine whether

---

[2] Justice Alito explained:

> In my view, such an attorney must (1) refrain from unreasonably providing incorrect advice and (2) advise the defendant that a criminal conviction may have adverse immigration consequences and that, if the alien wants advice on this issue, the alien should consult an immigration attorney. I do not agree with the Court that the attorney must attempt to explain what those consequences may be.

*Id.* at 375, 130 S.Ct. at 1487 (Alito, J., concurring).

each would be classified as a crime involving moral turpitude.[3]

Justice Alito also emphasized that the test announced by the majority could be difficult to apply in practice:

> [I]t will not always be easy to tell whether a particular statutory provision is "succinct, clear, and explicit." How can an attorney who lacks general immigration law expertise be sure that a seemingly clear statutory provision actually means what it seems to say when read in isolation? What if the application of the provision to a particular case is not clear but a cursory examination of case law or administrative decisions would provide a definitive answer? *See* Immigration Law and Crimes § 2:1, at 2-2 ("Unfortunately, a practitioner or respondent cannot tell easily whether a conviction is for a removable offense . . . . [T]he cautious practitioner or apprehensive respondent will not know conclusively the future immigration consequences of a guilty plea").

*Id.* at 381, 130 S.Ct. at 1490-91 (Alito, J., concurring).

---

[3] These examples were from the ABA Guidebook:

> See *id.*, at 134 ("Writing bad checks *may or may not* be a CIMT" (emphasis added)); *ibid.* ("[R]eckless assault coupled with an element of injury, but not serious injury, is *probably* not a CIMT" (emphasis added)); *id.*, at 135 (misdemeanor driving under the influence is generally not a CIMT, but may be a CIMT if the DUI results in injury or if the driver knew that his license had been suspended or revoked); *id.*, at 136 ("If there is no element of actual injury, the endangerment offense *may* not be a CIMT" (emphasis added)); *ibid.* ("Whether [a child abuse] conviction involves moral turpitude *may* depend on the subsection under which the individual is convicted. Child abuse done with criminal negligence *probably* is not a CIMT" (emphasis added)).

*Padilla*, 559 U.S. at 379, 130 S.Ct. at 1489 (Alito, J., concurring) (citing ABA Guidebook, at 134-36).

While 8 U.S.C. § 1227(a)(2)(A)(i) provides that classes of deportable aliens include those who have committed a general crime in the category of crimes of moral turpitude, as is evident from reading the provision, it does not clarify what crimes fit the category of CIMT:

Any alien who –

(I)    is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section 1255(j) of this title) after the date of admission, and

(II)    is convicted of a crime for which a sentence of one year or longer may be imposed,

is deportable.

In the years after the *Padilla* decision, courts have struggled with determining whether the immigration consequences of crimes, which did not have statutory provisions as explicit as that in *Padilla*, fit in the "clear" or "unclear" categories, and thus, what counsel is obliged to do. *Padilla* did not provide a clear answer as to whether a practitioner is obligated to do additional research if faced with the question of whether the crime a client is given an offer to plead to may be a CIMT and, if counsel has an obligation to conduct such research, how much research is enough to either reach a definitive answer on the likely immigration consequences, or to conclude the answer remains unclear.

The category of CIMT is certainly not as clear as 8 U.S.C. § 1227(a)(2)(B)(i), which mandated that Padilla was deportable for his plea to a "law . . . of a State . . . relating to a controlled substance[.]"  The effects of that provision were certainly "succinct, clear, and explicit[,]" "truly clear[,]" and "easily determined . . . simply from reading the text of the statute" rather than involving "some broad classification of crimes" or otherwise being "unclear or uncertain" as the majority opinion noted that "many of the scenarios" raised by Justice Alito were.  *Padilla*, 559 U.S. at 368-69, 130 S.Ct. at 1483.  As noted earlier, these scenarios included crimes for which there was confusion as to whether they were CIMT.

State courts have had to grapple with this problem and have reached a variety of solutions.  However, Kentucky appellate courts have yet to weigh in on this issue.

This analysis is further complicated by the very nature of the United States's immigration law, which has often been characterized as a "labyrinth" and "Byzantine."  *Castro-O'Ryan v. U.S. Dep't of Immigration and Naturalization*, 847 F.2d 1307, 1312 (9th Cir. 1987); *Mezo v. Holder*, 615 F.3d 616, 621 (6th Cir. 2010).  Immigration law is described "[w]ith only a small degree of hyperbole" as being "'second only to the Internal Revenue Code in complexity.'"  *Castro-O'Ryan*, 847 F.2d at 1312 (quoting E. Hull, *Without Justice For All* 107 (1985)).

Defining what a crime involving moral turpitude is requires navigating that labyrinth, a task that general criminal practitioners are generally not prepared to do.  As explained by some of our sister courts:

> [T]here is no clear consensus in the federal courts about how to define a "crime involving moral turpitude." Neither the Immigration and Nationality Act nor the Code of Federal Regulations defines the term, nor do they list examples of crimes in this category.  The term "moral turpitude" was intentionally left undefined by Congress and, thus, is open to interpretation by the Board of Immigration Appeals (Board) and the courts.

*People v. Valdez*, 67 N.E.3d 233, 240 (Ill. 2016) (citations omitted).  "Because the term 'crime involving moral turpitude' has no settled meaning in immigration law, the Board and the courts use various methodologies to determine whether a crime should be classified as a CIMT."  *Id*.  "The characterization of an offense as a CIMT is a matter of statutory interpretation.  The moral turpitude determination has traditionally been based upon the definition of the offense cited in the judgment of conviction[.]"  *Lopez-Penaloza v. State*, 804 N.W.2d 537, 545 (Iowa App. 2011) (citation omitted).  "Thus, ascertaining whether a particular crime is a CIMT must be done on a case-by-case basis, though there are some crimes that have long been viewed as involving moral turpitude, particularly those involving an element of fraud."  *Id.* (citation omitted).

"Indeed, even for those who are trained in immigration law, it may be difficult to ascertain whether a particular crime would be considered as a crime

involving moral turpitude or as an aggravated felony." *State v. Sanmartin Prado*, 141 A.3d 99, 132 (Md. 2016). Therefore, criminal defense counsel may well have trouble giving accurate advice concerning whether a particular crime falls within the category of being a CIMT, and could err in unequivocally telling a defendant that immigration authorities will consider a particular crime to be a CIMT which would make the defendant deportable and inadmissible to the United States; this puts counsel in the position of potentially providing misinformation which is too definite that removal proceedings will ensue, which could thus dissuade a defendant from taking a beneficial plea offer. *State v. Ortiz-Mondragon*, 866 N.W.2d 717, 735 (Wis. 2015).

We have before us a dispute about which of the two branches of the *Padilla* standard apply, the one with clear consequences that requires equally clear advice, or the one with unclear consequences that only requires the advice that there may be immigration consequences. The threshold question we are faced with here, is as stated by our sister court:

> [W]hether the immigration consequences of [the appellant's] guilty plea . . . were *clear and easily ascertainable*, such that the Sixth Amendment required [the appellant's] trial counsel to recognize those consequences and communicate them to petitioner, or whether they were *unclear or uncertain*, such that the Sixth Amendment required only that he advise [the appellant] that a conviction might carry a risk of adverse immigration consequences. If the immigration consequences of [the appellant's] plea were clear and

> easily ascertainable, then [the appellant's] trial counsel was personally responsible for ensuring that [the appellant] received correct advice on that issue . . . . Conversely, if they were unclear or uncertain, then trial counsel only needed to put [the appellant] on general notice that his plea might have immigration consequences, at which point it was [the appellant's] choice whether to consult an immigration attorney before entering the plea.

*Madrigal-Estrella v. State*, 463 P.3d 23, 30 (Or. App. 2020) (citations omitted).

*See People v. Dominguez*, 64 N.E.3d 1191, 1199 (Ill. App. 2016) (discussing the test being which of the two branches of *Padilla* applies); *Paxtor v. Commonwealth*, No. 2012-CA-002196-MR, 2014 WL 3026750, at *2 (Ky.App. Jul. 3, 2014) (unpublished) (explaining "the pivotal question presented is whether the adverse immigration consequence of appellant's guilty plea was legally straightforward or legally uncertain to a reasonable defense attorney").[4]

In challenging counsel's advice on the immigration consequences of a plea as being ineffective, the defendant should explain

> *how* the immigration consequences of a plea would have been clear and easily ascertainable to any competent attorney, including identifying the relevant sources of law. Relatedly, . . . the court's task is to review the identified sources of law and determine whether they actually made the immigration consequences of the plea clear and easily ascertainable.

---

[4] We do not cite this unpublished case as authority, but simply to show that this is how this issue is generally understood.

*Madrigal-Estrella*, 463 P.3d at 31.  *See Dominguez*, 64 N.E.3d at 1199 (discussing which of the two branches of *Padilla* applies and placing the burden on the defendant to establish that the consequences are clear, requiring clear advice).

Our sister courts have dealt with these difficulties in a variety of ways. Some have categorically declared that for all crimes (like CIMT offenses) which do not make an alien deportable through clear statutory language (unlike Padilla's drug crime), the terms are not succinct, clear, and explicit, but are rather unclear or uncertain, and thus only require attorneys to advise their clients that they may be deported.  *See, e.g.*, *People v. Lawrence*, 148 A.D.3d 1472, 1473 (N.Y. App. Div. 2017) (quoting *Padilla*, 559 U.S. at 369, 130 S.Ct. at 1483) (citations omitted) (explaining "[w]here . . . deportation consequences of a guilty plea are less certain because removal was sought for a crime involving moral turpitude, counsel's obligation is more limited, requiring that a defendant be advised that a guilty plea 'may carry a risk of adverse immigration consequences.'").  Other courts have generally held to that approach, except when it comes to crimes involving fraud as it is sufficiently clear that such crimes are considered to be CIMT; therefore, crimes involving fraud require the advice that pleading to them will make defendants eligible for deportation.  *See Jordan v. De George*, 341 U.S. 223, 232, 71 S.Ct. 703, 708, 95 L.Ed. 886 (1951) (explaining "[t]he phrase 'crime involving moral turpitude' has without exception been construed to embrace fraudulent

-22-

conduct."). Other courts have required research as to whether the specific crime or similar crimes have previously been ruled to be CIMT and make decisions as to whether an attorney's advice was sufficient depending upon what that research would have revealed in each individual case. *See, e.g.*, *State v. Nkiam*, 778 S.E.2d 863, 870 (N.C. App. 2015) (noting "[w]hen other courts have found deportation consequences unclear for particular guilty pleas, they have pointed to the need for trial counsel to look beyond the plain language of the United States Code in order to reach a conclusion regarding the deportation consequences for the defendant."). Undoubtedly, the third approach creates the most uncertainty for practitioners about how much research is enough and what crimes are sufficiently similar.

Fortunately, in resolving the question of what approach our Courts should take, we are not writing on an entirely blank slate. In *Commonwealth v. Pridham*, 394 S.W.3d 867 (Ky. 2012), the Kentucky Supreme Court interpreted whether *Padilla* applies to two different types of potential advice, whether our violent offender statute applied, and when a sexual offender would be eligible for parole. Regarding our violent offender statute, the Court explained that the duty of counsel to give accurate advice was clear:

> In *Padilla*, the Court observed that the relevant immigration statute was "succinct, clear, and explicit in defining the removal consequence for Padilla's conviction." 130 S.Ct. at 1483. Here, the violent offender statute, KRS 439.3401, is also "succinct, clear and explicit" in deeming a person convicted of a Class A

felony, as Pridham was, a violent offender and then providing he "shall not be released" until he has served 85% of his sentence. Just as "[t]he consequences of Padilla's plea could easily be determined from reading the removal statute," 130 S.Ct. at 1483, the parole eligibility consequences of Pridham's plea could easily be determined by reading the violent offender statute. Finally, like the immigration statutes at issue in *Padilla*, the violent offender statute, KRS 439.3401, has for years now been a prominent fixture of our criminal law. It is expressly referred to in KRS 532.080, the persistent felony offender sentencing statute, under which Pridham was likely to be sentenced had he gone to trial.

We do not believe it unreasonable to expect of competent defense counsel an awareness of the violent offender statute and accurate advice concerning its effect on parole eligibility. We agree with the Court of Appeals, therefore, that under *Padilla*, Pridham has stated a Sixth Amendment claim of ineffective assistance of counsel and is entitled to an evidentiary hearing on the merits of his claim, at which he will have an opportunity to prove that counsel misadvised him as alleged and that absent the misadvice there is a reasonable probability that he would have insisted upon a trial.

*Pridham*, 394 S.W.3d at 878-79 (footnotes omitted). *See Stiger v. Commonwealth*, 381 S.W.3d 230, 236 (Ky. 2012) (agreeing that "counsel's alleged failure to take the violent offender statute into account when giving advice about parole eligibility would constitute, if proven, deficient performance").

However, the *Pridham* Court came to a different conclusion as to counsel's responsibility to advise criminal defendants about parole eligibility for sex offenders, explaining as follows:

> Unlike the 85% parole eligibility evident from the face of the violent offender statute, there is no place in Kentucky law where there is a "succinct, clear, and explicit," *Padilla*, 130 S.Ct. at 1483, answer to the issue of whether a sex offender treatment program can be completed in two years. Any parole eligibility effect, therefore, cannot, like the deportation at issue in *Padilla*, be said to be enmeshed with the defendant's sentence and easily ascertainable by reference to statute. We agree with the Court of Appeals and the trial court that the challenged advice in this case falls outside what the Sixth Amendment requires of counsel.

394 S.W.3d at 882 (footnote omitted).

We observe that in reaching its conclusions in each of these situations, the Kentucky Supreme Court focused on whether or not the relevant statutes provided a clear answer as to the outcome in determining what advice counsel had to give.

Additionally, after *Pridham*, the Kentucky Supreme Court has continued to emphasize the mandatory requirement that counsel give correct advice where the consequences are easily discernable from reading a statute. In *Commonwealth v. Thompson*, 548 S.W.3d 881, 891 (Ky. 2018), a case concerning the failure of counsel to advise the appellant that the Sexual Offender Registration Act (SORA) would apply to him, the Court determined that "given the automatic,

serious and lifelong consequences of registration – consequences readily discernible by reading the SORA statute – we conclude that effective assistance of counsel pursuant to the Sixth Amendment requires informing a defendant about the fact of mandatory sex offender registration and what that entails." In its subsequent discussion, the Court noted that "[s]ex offender registration, like the violent offender statute, is codified and can be understood by reading the relevant Kentucky Revised Statute." *Id.* at 892. The Court emphasized again that "[t]his serious and automatic consequence of a plea to certain charges can 'easily be determined by reading . . . the statute,' *Pridham*, 394 S.W.3d at 878 (quoting *Padilla*, 559 U.S. at 357, 130 S.Ct. 1473), and is a matter that competent counsel would and should discuss with his client." *Id.* at 893.

Based upon *Pridham*, we believe that our Supreme Court is interpreting the first of the two categories in *Padilla*, when specific and conclusive advice must be given, narrowly. The unpublished case of *Pierre*, which Ebu relies upon to establish his claim for ineffective assistance of counsel, does not support his position and is consistent with *Pridham*.

In *Pierre*, the question involved whether counsel was ineffective for failing to "inform him he would automatically be deported upon pleading guilty to felony burglary and robbery." *Pierre*, 2014 WL 5064169, at *6. 8 U.S.C. § 1227(a)(2)(A)(iii) succinctly provides: "Any alien who is convicted of an

aggravated felony at any time after admission is deportable." Pursuant to 8 U.S.C. § 1101(a)(43) "aggravated felony" is defined as including categories (A) through (U), with 8 U.S.C. § 1101(a)(43)(G) including "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year[.]" (Footnote omitted indicating an "is" should probably precede the "at.") The factual finding after the evidentiary hearing was that Pierre's counsel (who did not independently recall what he advised Pierre but testified that he always advised defendants about possible deportation consequences as this is mentioned in the plea form), advised Pierre that he could face possible deportation as a result of accepting the plea agreement.

The way the opinion is written, it appears that the Court gave Pierre the benefit of the doubt that counsel's advice was defective, noting "[a]fter wading through the immigration law ourselves, we are loath to say [trial counsel] provided bad advice," pointing out that counsel did not know that Pierre's removal was certain since he was pleading to an aggravated felony, a change made to immigration law several years prior, which made Pierre ineligible for a waiver to deportation pursuant to 8 U.S.C. § 1229b(a)(3). *Pierre*, 2014 WL 5064169, at *7. The Court concluded that even if it accepted that the trial counsel's advice "should have been more precise, and therefore, was deficient," there was no prejudice and, therefore, relief was unwarranted. *Id*.

-27-

*Pierre* is distinguishable from Ebu's situation as it decided what kind of advice must be provided regarding aggravated felonies, with the specific charges Pierre faced specifically qualifying for this category as defined by statute. Resolving whether a particular crime is a CIMT is generally more complicated than merely reviewing statutes (which are complex enough) and based on *Pridham*, it appears that reading beyond the statutes is not required in the Kentucky Supreme Court's interpretation of *Padilla*.

While Ebu did generally argue that the CIMT section is "clear and explicit[,]" indicated that "theft and fraud" are crimes considered to constitute moral turpitude, and stated that "[a] legal inquiry into Westlaw shows multiple cases of crimes considered to be of moral turpitude which result in deportation[,]" Ebu did not cite any of these cases or directly establish that the crimes for which he pled have clearly been determined (in the timeframe before he entered his plea) to be CIMT. While we could summarily reject Ebu's argument based on his failure to adequately establish through citation to appropriate authorities that his misdemeanor convictions clearly qualified as CIMT before he was seized by ICE, instead, we choose to establish a broad holding that will be of help to Kentucky Courts grappling with these complex immigration issues and what advice is necessary.

We hold that *unless* a defendant can identify federal statutory provisions that in and of themselves (without additional legal research) establish that pleading guilty to a particular Kentucky crime makes that defendant deportable and ineligible for cancellation of removal, this crime is placed in the second *Padilla* category of crimes where "the law is not succinct and straightforward[.]" *Padilla*, 559 U.S. at 369, 130 S.Ct. at 1483. In such a situation, "a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Id.* That is counsel's *only duty*. This definitive rule in categorizing when crimes fall into the second *Padilla* category will make it easier for parties and attorneys to understand what trial counsel's duties are and will make it much easier for courts to evaluate whether counsel has acted as required under the Sixth Amendment, while still appropriately following *Padilla* and providing defendants with constitutionally appropriate notice as to the potential consequences of their pleas or convictions.

While Justice Alito suggests that counsel should also recommend consultation with an immigration attorney,[5] we recognize that the majority opinion

---

[5] Justice Alito, who would have the same advice be applicable to all, rather than having the two categories the majority opinion decided upon, stated "[w]hen a criminal defense attorney is aware that a client is an alien, the attorney should advise the client that a criminal conviction may have adverse consequences under the immigration laws and that the client should consult an immigration specialist if the client wants advice on that subject." *Id.* at 387, 130 S.Ct. at 1494

in *Padilla* did not rule that this is constitutionally required in either category of case. However, we strongly recommend that counsel offer this additional advice.

While we do not discourage trial counsel from conducting research on immigration law, we caution practitioners that any advice they give beyond the standard must still be accurate, and unless the answer is clear, counsel should discuss possibilities, rather than certainties. Such an approach should galvanize defendants into consulting with immigration attorneys for answers to the questions their defense attorneys have raised, and indeed defense attorneys should encourage and facilitate such discussions whenever possible.

The circuit court found that trial counsel advised Ebu that trial counsel was uncertain of the effect Ebu's pleas would have on his immigration status, indicated that he may be deported, and advised him to consult with an immigration attorney. Trial counsel should have reviewed 8 U.S.C. § 1227 to see whether Ebu's original or amended charges had explicit deportation consequences,[6] and

---

(Alito, J., concurring). Justice Alito further opined that "an alien defendant's Sixth Amendment right to counsel is satisfied if defense counsel advises the client that a conviction may have immigration consequences, that immigration law is a specialized field, that the attorney is not an immigration lawyer, and that the client should consult an immigration specialist if the client wants advice on that subject." *Id.* at 388, 130 S.Ct. at 1494 (Alito, J., concurring).

[6] We note that Ebu's original crimes likely would have been considered aggravated felonies just as Pierre's were. Thus, counsel's advice that Ebu would definitely be subject to deportation if convicted on the felonies was correct. However, it is important to recognize that whether other crimes are considered aggravated felonies is not as clear for certain classes of crimes, especially those that do not neatly fit into the listed categories. Additionally, apparently pleading guilty to misdemeanors is not a guarantee that they will not be treated as felonies if the misdemeanors are subject to a year (twelve months or 365 days is treated as a year) of imprisonment. As recounted

then advised Ebu. Trial counsel could have advised Ebu that his amended charges could be CIMT and if immigration authorities determined that they qualified under this category, he could be deported. However, any failure to do such research was harmless as trial counsel's advice that Ebu's plea to the misdemeanors could result in deportation was nonetheless correct. Trial counsel acted appropriately by giving such advice where there was no clear statutory answer as to whether the misdemeanors would qualify as CIMT and recommending that Ebu, who had been released from custody on bond, consult with an immigration attorney who would understand that matter better than trial counsel did and could provide more specific advice.

Therefore, having established that based on the factual findings the circuit court made that Ebu's counsel offered proper legal advice, we need not proceed to the prejudice prong of *Strickland*. We note, however, that Ebu is

in *United States v. Urias-Escobar*, 281 F.3d 165, 167 (5th Cir. 2002), a case discussing sentencing guidelines enhancements based on conviction of an aggravated felony as defined in 8 U.S.C. § 1101(a)(43), multiple circuits have ruled that a misdemeanor punishable by imprisonment of at least one year can be an aggravated felony. Additionally, classification can vary as to whether state felonies will be treated as aggravated felonies if the equivalent federal crime is a misdemeanor under federal law. *See Lopez v. Gonzales*, 549 U.S. 47, 52-60, 127 S.Ct. 625, 629-633, 166 L.Ed.2d 462 (2006) (thoroughly discussing this issue and ultimately holding "a state offense constitutes a 'felony punishable under the Controlled Substances Act' [*see* 18 U.S.C. § 924(c)(2); 8 U.S.C. § 1101(a)(43)(B)] only if it proscribes conduct punishable as a felony under that federal law."). So, while the classification of certain crimes as aggravated felonies at first blush appears easy and straightforward, results can vary depending on the specifics.

incorrect that it would have been easy to avoid mandatory removal through plea negotiations by structuring a sentence of 364 days on the misdemeanors.[7] Ebu acted at his own peril in declining to consult with an immigration attorney when his own trial counsel said he was uncertain the effect that pleading guilty to these misdemeanors would have on Ebu's immigration status.

Accordingly, we affirm the Fayette Circuit Court's order denying Ebu's motion to set aside his plea based on receiving inaccurate advice as to the probable immigration consequences of accepting the Commonwealth's plea offer. Trial counsel properly advised Ebu that his plea could have consequences to his status as a legal resident of the United States and advised him to consult an immigration attorney; more was not required where 8 U.S.C. § 1227(a)(2)(A)(i)(I)-

---

[7] 8 U.S.C. § 1227(a)(2)(A)(i)(I)-(II) has been interpreted as applying where a crime could be sentenced for up to one year, regardless of the actual sentence imposed. *See Velasquez-Rios v. Wilkinson*, 988 F.3d 1081, 1088 (9th Cir. 2021) (determining a man who pled guilty to misdemeanor forgery and was sentenced to twelve days in jail, eight days of community service and a fine had committed a CIMT because the maximum sentence for his crime was one year and a later change to the statute making the maximum sentence 364 days did not apply retroactively to change the nature of his conviction). *See also Mancilla-Delafuente v. Lynch*, 804 F.3d 1262, 1265 (9th Cir. 2015) (interpretating the petty offense exception to CIMT in 8 U.S.C. § 1182(a)(2)(A)(ii) and noting that this exception does not apply to a crime for which the sentence could have been one year, explaining "we defer to the BIA's reasonable approach of considering the sentence that could have been imposed, not the actual sentence."); *Lucio-Rayos v. Sessions*, 875 F.3d 573, 584 n.16 (10th Cir. 2017) (explaining that a CIMT subject to a 365-day sentence does not qualify for the petty offense exception as 8 U.S.C. § 1227(a)(2)(A)(i) includes CIMT "for which a sentence of one year or longer may be imposed"). The confusion of postconviction counsel reveals the very real difficulty of non-immigration attorneys attempting to understand the United States's convoluted immigration law without typically practicing in this area.

(II) only provided that crimes involving moral turpitude were deportable offenses but did not clarify whether Ebu's crimes fit within this category.

ALL CONCUR.

BRIEFS FOR APPELLANT:

J. Ryan Chailland
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Ken W. Riggs
Assistant Attorney General
Frankfort, Kentucky